UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | |
|---|---|
| NEW YORK PACKAGING II LLC, d/b/a REDIBAGUSA, | |
| Plaintiff, | |
| v. | Civil Action No. 1:22-cv-20276 |
| PRIVATE D CAPITAL GROUP CORPORATION, | **JURY TRIAL DEMANDED** |
| SOLUCIONÉS COSMÉTICAS, SA DE CV, | |
| DAVID ROZINOV, | |
| JOSÉ BAZBAZ, | |
| ISAAC SABA, | |
| DAVID ALÍ LOAEZA, | |
| MANUEL MARTÍNEZ ALÍ, | |
| SANTIAGO MARTÍNEZ ALÍ, | |
| SBR QUALITY PRODUCTS, and | |
| EURO COSMETICS INTERNATIONAL, | |
| Defendants. | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

## INTRODUCTION

1.      Defendants operate a network of factories and shell companies to profit from importing into the United States substandard personal care products manufactured in Mexico.

This Complaint refers to that network as the "SBR Enterprise," after the initials of three of the enterprise's leaders—Defendants Isaac Saba, José Bazbaz, and David Rozinov.

2.      In the early days of the COVID-19 pandemic, Defendants set into motion a scheme to sell Mexican-made hand sanitizer in the United States.  A key piece missing from their scheme was a well-established American company like Plaintiff New York Packaging II LLC, d/b/a RediBagUSA ("RediBag"), which could distribute the sanitizer to its existing customer base.  Defendants sought to insert RediBag as a buffer between the SBR Enterprise and the ultimate customers in an effort to avoid the consequences of selling low quality and dangerous sanitizer.

3.      To persuade RediBag to participate in their distribution network, Defendants lied to RediBag about the safety, quality, and source of the sanitizer.  Defendants repeatedly assured RediBag that the sanitizer was made with pure ethanol sourced from the United States, complied with all FDA regulations, and was safe.  In reality, a significant volume of the sanitizer was made with methanol-laced ethanol sourced from Mexico, did not comply with FDA regulations, and was potentially toxic.

4.      Relying on Defendants' misrepresentations, RediBag paid Defendants more than $9 million for nearly 2.5 million bottles of sanitizer, which RediBag then sold to its customers.

5.      Ultimately, after RediBag learned of the methanol contamination from the FDA, all of the sanitizer was recalled in July 2020.  RediBag has been left to deal with its customers' subsequent demands for replacement sanitizer and refunds, and has spent millions of dollars paying for such replacement sanitizer and refunds out of its own pocket.

6.      While Defendants agreed in August 2020 to provide replacement sanitizer and refunds, they have failed to do so.  Instead, Defendants have strung RediBag and its customers

along for more than a year with continuing factual misrepresentations about Defendants' ability to provide replacement sanitizer.  Defendants' lies and stall tactics have caused RediBag's customers to take the position that RediBag has lost the ability to cure.

7.      Defendants have committed numerous acts of wire fraud.  As detailed below, Defendants' commission and conspiracy to commit those federal crimes violated Sections 1962(c) and 1962(d) of the federal RICO Act.

8.      Defendants also are liable for fraudulent concealment, violation of the New York and Florida statutes barring unfair and deceptive acts and practices, and civil conspiracy, as well as breaches of numerous contracts and duties under the UCC.

9.      In addition, Defendants abused the corporate form of their companies, shifting and commingling assets for improper purposes, including inducing RediBag to enter into contracts for the sale of contaminated sanitizer and trying to escape liability for the contaminated sanitizer.  As alleged below, several of the entity Defendants are really the alter egos of the individual Defendants and each other.

10.     RediBag should be made whole for the damages it has suffered as a result of Defendants' misconduct, which total over $10 million.

## THE PARTIES

11.     Plaintiff RediBag is a limited liability company organized under the laws of New York with its principal place of business at 135 Fulton Ave Garden City Park, New York 11040.

12.     Defendant Private D Capital Group Corporation ("Private D") is a corporation organized under the laws of Delaware with its principal place of business at 16901 Collins Avenue, Apartment 2003 in Sunny Isles Beach, Florida and/or 210 Central Park South, 23A in New York, New York.

3

13.     Defendant Solucionés Cosméticas, SA de CV ("Solucionés") is a corporation organized under the laws of Mexico with its principal place of business at Año de Juárez No. 110, Iztapalapa, Mexico.

14.     Defendant David Rozinov is an individual residing in and domiciled in Florida.

15.     Defendant José Bazbaz is an individual residing in and domiciled in New York.

16.     Defendant Isaac Saba is an individual residing in and domiciled in Mexico City, Mexico.

17.     Defendant David Alí Loaeza is an individual residing in and domiciled in Texas.

18.     Defendant Manuel Martínez Alí is an individual residing in and domiciled in Mexico City, Mexico.

19.     Defendant Santiago Martínez Alí is an individual residing in and domiciled in Tlalpan, Mexico.

20.     Defendant SBR Quality Products Corp ("SBR Quality Products") is a corporation organized under the laws of Delaware with its principal place of business at 16901 Collins Avenue, Apartment 2003 in Sunny Isles Beach, Florida.

21.     Defendant Euro Cosmetics International ("Euro Cosmetics") is a corporation organized under the laws of Delaware with its principal place of business at 16192 Coastal Highway in Lewes, Delaware.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964 and 28 U.S.C. § 1331 because Plaintiff is asserting federal RICO Act claims.

23.     This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because the claims are so related to Plaintiff's federal claims that they form part of the same case or controversy.

4

24.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims alleged in this action occurred in this judicial district.

25.     Venue is also proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in this judicial district, there is no district where all Defendants reside, and at least one Defendant resides, is found, has an agent, or transacts its affairs in this judicial district.

## FACTUAL ALLEGATIONS

**A.      RediBag Is a Long-Standing U.S. Company that Prides Itself on Its Excellent Reputation and Strong Customer Relationships.**

26.     RediBag is a U.S.-based private company founded in 1957 as New York Packaging.  Known for its patented, recognizable paper and plastic grocery bags, RediBag delivers plastic and paper products to grocery stores, restaurants, delis, dry cleaners, and industrial customers worldwide.

27.     Over the last sixty-plus years, RediBag has built durable relationships with its customers based on its reliability and the high-quality products it supplies both to wholesalers and retailers across the globe.

**B.      Defendants and Their Web of Companies Profit by Selling Hand Sanitizer and Other Products from Mexico.**

28.     Although Defendants deliberately have obfuscated the precise business relationships among themselves and their various companies, RediBag has been able to uncover some information about the many formal and informal connections among the players.

29.     Defendants David Rozinov, José Bazbaz, and Isaac Saba are principals of SBR Group, which Rozinov has described as their "USA holding company."  "SBR" appears to stand for the first initials of the three principals—Saba, Bazbaz, and Rozinov.  Bazbaz has explained

5

that SBR was set up "to sell some Mexican products my family makes in the U.S [sic] so we can do everything through this entity."

30.     Defendant SBR Quality Products is a Delaware corporation formed in June 2020. Its registered address is on Collins Avenue in Sunny Isles Beach, Florida, at one of Rozinov's homes.

31.     Rozinov is the CEO of SBR Quality Products.  Bazbaz is its incorporator and President, and Saba is its COO.

32.     According to its website, SBR Quality Products offers a variety of wellness and home goods, including cleaning and sanitary supplies.  SBR Quality Products has also done business under the name SBR Quality Brands.  Bazbaz began using an "SBR Brands" email address to communicate with RediBag in September 2020.

33.     In addition to his role at SBR, Rozinov is an officer and advisor of a number of investment firms and cannabis-related companies.

34.     Rozinov is also the President of Private D.  Private D is a Delaware corporation formed in 2014.  Its corporate status has been "inactive" since March 2017 due to delinquent taxes and failure to file annual reports.  Private D uses Rozinov's Collins Avenue address in Sunny Isles Beach, Florida, and has at least one bank account in Florida.  Private D also has used a New York City address associated with Rozinov.  Private D appears to be a shell company that has no meaningful business operations other than its dealings with RediBag.

35.     Rozinov introduced RediBag to his "partner" Bazbaz in Mexico City.  In addition to serving as President of SBR Quality Products, Bazbaz maintains a corporate email with the capital management company Tuttle Tactical Management LLC, which is likewise associated with Rozinov.  Bazbaz also has given his address as 17475 Collins Avenue in Sunny Isles Beach,

Florida, which is just down the street from the Collins Avenue address for Rozinov, SBR Quality Products, and Private D.  Bazbaz appears to split his time among New York City, Mexico City, and Florida.

36.     Rozinov also has said that Bazbaz "controls holdings" in Mexico, including bottling and plastics plants and transportation companies.

37.     Isaac Saba is part of the Saba family, a wealthy and well-known family in Mexico.  Saba and Bazbaz have co-founded at least two companies together, and overlapped at Universidad Iberoamericana in Mexico City.

38.     The Saba family is heavily involved in the pharmaceutical industry in Mexico. The family controls Solucionés, which is located in Mexico City.  Although Solucionés's website claims it has more than forty years of experience in the cosmetic industry, apparently in reference to the Saba family's experience in the industry, Solucionés was not incorporated in Mexico until 2009.  Solucionés manufactures hair and skin products.

39.     The Saba family uses a network of companies, including Solucionés, as "maquilas," or assembly plants, to make products to the specifications of other companies affiliated with the Sabas.  Saba and Bazbaz appear to have utilized Solucionés's existing infrastructure to move quickly and take advantage of the business opportunity created by the pandemic.  Saba and Bazbaz likely financed the production of hand sanitizer and other products through Solucionés, which then could import products to the United States under its existing brands and/or permits.  Bazbaz visited Solucionés's factory in Mexico City, monitoring production.

40.     Defendant Manuel Martínez Ali ("Manuel Martínez") is the Operations and Projects Director at Solucionés.  Bazbaz described him as the head of production at the Solucionés factory.

41.     Defendant Santiago Martínez Ali ("Santiago Martínez") is a Senior Project Development Manager at Solucionés.  Bazbaz told Redibag that Manuel Martínez and Santiago Martínez were the "plant managers" for Solucionés.  Both Manuel Martínez and Santiago Martínez used "Solucionés Cosmeticas" email addresses.

42.     Manuel Martínez and Santiago Martínez were also at Universidad Iberoamericana at the same time as Saba and Bazbaz.

43.     Defendant David Alí Loaeza ("David Alí") was the President of Solucionés until at least October 2020, after previously serving as Solucionés's Administrator.  His wife likewise was an officer of Solucionés.  David Alí and his wife also are believed to have purchased Solucionés in 2013 or before.

44.     As described below, David Alí was heavily involved in communications about the FDA recall, using a "Solucionés Cosmeticas" email address.  David Alí also is the President and sole director of Defendant Euro Cosmetics, which owns the warehouse where the hand sanitizer was shipped.  In addition, David Alí operates at least three other companies out of the same registered address as Solucionés.

45.     Solucionés, Manuel Martínez, Santiago Martínez, and David Alí are referred to collectively as the "Solucionés Defendants."

**C.     RediBag Ordered Hand Sanitizer from Defendants to Provide to RediBag's Customers.**

46.     In mid-March 2020, as the COVID-19 pandemic began to sweep through the United States and hand sanitizer was much-needed and in high demand, RediBag began

discussing with Rozinov the possibility of selling hand sanitizer to RediBag's extensive customer base, which would then sell the sanitizer to individual consumers.

47.     In late March or early April 2020, Rozinov and Bazbaz introduced RediBag to the Solucionés Defendants.  Early meetings included Rozinov, Bazbaz, and Manuel Martínez, and may have included Saba.  RediBag and Defendants agreed to work together to sell hand sanitizer to RediBag's customers.

48.     The venture contemplated that Solucionés would manufacture and import personal care products such as hand sanitizer to the United States, which RediBag would then market and sell to its customers.  All parties were aware that the hand sanitizer was intended for retail sale to consumers.  Rozinov and Bazbaz were to facilitate communication between the Solucionés Defendants and RediBag.

49.     The Solucionés Defendants, Rozinov, Bazbaz, and RediBag coordinated regarding label design, product specifications, and shipping.

50.     After obtaining orders from its customers, RediBag would submit purchase orders to Private D.  The parties regarded these purchase orders as contracts to deliver the quantity ordered by the date requested for the price shown.  The purchase orders did not disclaim any warranties.

51.     Between April 2020 and July 2020, RediBag submitted more than 75 purchase orders to Private D for over 200,000 cases—or nearly 2.5 million bottles—of hand sanitizer.

52.     Solucionés would manufacture hand sanitizer in Mexico and import it into the United States to fill the purchase orders.  Customs paperwork identified Private D as the consignee of the sanitizer.

53.     On or about April 13, 2020, Solucionés began importing hand sanitizer from its Mexico City factory to Euro Cosmetics at its shipping warehouse in Laredo, Texas.  Between April 13 and June 2, 2020, Solucionés imported over a hundred shipments to Euro Cosmetics.

54.     RediBag coordinated with the Solucionés Defendants, Rozinov, and Bazbaz to make arrangements to pick up the hand sanitizer in Laredo and deliver it to RediBag's customers around the country.  Many of the RediBag customers that purchased hand sanitizer sell product in New York and Florida, among other states.

55.     Private D issued approximately 75 invoices to RediBag, which RediBag paid by wire.  The invoices were dated between April 17, 2020 and June 29, 2020.  The invoices to RediBag included no contact information for Private D other than Rozinov's personal email address, drozinov16@gmail.com.

56.     Between April 21, 2020 and July 1, 2020, RediBag paid Private D a total of $9,113,851.36 for hand sanitizer.

57.     RediBag does not know the details of the monetary or other agreements between or among the Defendants, including any agreements between Private D and Solucionés and any agreements between Solucionés and Euro Cosmetics.

**D.      Defendants Repeatedly Assured RediBag that Their Sanitizer Was Made with Pure Ethanol Sourced from the United States.**

58.     Defendants repeatedly touted the exceptional purity and safety of its Bersih hand sanitizer, and urged RediBag to market Bersih to its customers on that basis.  Until Defendants were forced to admit the truth as a result of an FDA investigation, Defendants also told RediBag orally and in numerous emails and text messages that Bersih was made with ethanol sourced from the United States.

10

59.     Bazbaz frequently acted and communicated with RediBag on behalf of and with the knowledge of both Private D and Solucionés.

60.     On April 3, 2020, Bazbaz sent RediBag a technical sheet and safety data sheet for the proposed Bersih product.  The technical sheet stated that the ingredients in Bersih hand sanitizer, a "[h]omogeneous translucent gel of light color, without aroma," were "[e]thyl alcohol, deionized water, propylene glycol, carbomer, sodium hydroxide."

61.     On April 8, 2020, Solucionés provided RediBag a specifications sheet indicating that Bersih's sole active ingredient was 70 percent ethanol.

62.     On May 14, 2020, after RediBag began receiving complaints from customers about Bersih having a strong alcoholic smell, unlike the original samples RediBag and the customers had received, Bazbaz confirmed to RediBag that Solucionés was "using American alcohol, made in USA with all the right paperwork."

63.     On May 29, 2020, Bazbaz and the Solucionés Defendants again highlighted the purity of the ethanol used to manufacture their products.  They pressed RediBag to emphasize to customers as a selling point that Solucionés "uses FDA approved made in USA alcohol (unlike most producers, there's a lot of nasty stuff out there)."

64.     The following day, Bazbaz, copying Rozinov and acting on behalf of himself, Rozinov, Private D, SBR Quality Products, and the Solucionés Defendants, reiterated to RediBag over email that Bersih was made with "FDA approved alcohol – made in the USA.  [It is r]eally the best out there."

65.     Bazbaz also attached two documents that he called "alcohol diligence documents," and suggested that "Maybe these docs can help [the] sales force…."  The

11

documents allegedly evidenced Defendants' claims that Solucionés sourced its ethanol from a U.S.-based company and that the ethanol was nearly 100 percent pure.

66.     Isaac Saba is the one who obtained the "alcohol diligence" documents and forwarded them to Bazbaz, using an email address associated with Isaac Saba's company Grupo Xtra.

67.     One of the "alcohol diligence" documents was a U.S. Customs "Certificate of Origin" form dated April 22, 2020 for almost 80,000 barrels of "undenatured ethanol derived from corn" exported by Freepoint Commodities L.L.C. ("Freepoint") and onboard the vessel MTM Gibraltar.  The producer and importer names appear to be whited out, suggesting that Solucionés was not actually the recipient of the alcohol, although RediBag did not notice that at the time.  The country of origin for the ethanol is identified as the United States.  As discussed below, Defendants have provided no evidence that Solucionés actually used alcohol from Freepoint to manufacture sanitizer.

68.     The other document attached to Bazbaz's email was a "Certificate of Analysis" from AmSpec Services LLC ("AmSpec") purporting to show that AmSpec tested a sample of undenatured alcohol from the vessel MTM Gibraltar on April 21, 2020 in Deer Park, Texas.  The certificate indicated that the undenatured ethanol tested was over 99 percent ethanol, and less than .01 percent methanol.

69.     As Defendants intended, RediBag relied on these documents and Defendants' representations about them.  RediBag reasonably understood Bazbaz's email and his reference to "alcohol diligence documents" to mean that Solucionés was and had been manufacturing hand sanitizer using the ethanol from Freepoint described in the certificate of origin and tested by AmSpec.  RediBag also forwarded the documents to multiple customers to support Defendants'

claim that Bersih was methanol-free and manufactured using pure ethanol sourced from a reputable U.S. company.

70.     On June 2, 2020, Bazbaz, again copying Rozinov and acting on behalf of himself, Rozinov, Private D, SBR Quality Products, and the Solucionés Defendants, sent RediBag another document created by the Solucionés Defendants to persuade RediBag and its customers that Defendants' hand sanitizer was safe and used pure ethanol from the United States.  The document represented that "[a]ll alcohol used in [Bersih] is made in the USA by an FDA Approved manufacturer."  Bazbaz expressed his expectation that RediBag would share the information with its customers, explaining the information "can help [the] sales team explain why our product is better…"

71.     On June 3, 2020, Bazbaz, once again copying Rozinov and acting on behalf of himself, Rozinov, Private D, SBR Quality Products, and the Solucionés Defendants, sent RediBag another set of "Alcohol supplier docs."  Bazbaz urged RediBag to tout the quality of the alcohol to its customers, writing that the documents would "really help us stand out vs other products (domestic and international) using low-grade alcohol that will ultimately: (1) Be denied entry to U.S.A[.]; (2) Get banned by FDA."

72.     One document attached to the email was a letter from Oxy Services S.A.P.I. de C.V. ("Oxy"), an alcohol supplier and distributor.  The letter stated that Oxy ethanol was "Top Purity 99.5%" and complied with FDA and other guidelines.  The letter further stated that Oxy "guarantees that the Bersih product distributed by RediBag USA is made with this Oxy alcohol."

73.     Another document attached to the email was a list prepared by the Solucionés Defendants of characteristics purportedly possessed by Bersih, including that it "[m]eets FDA Policy Requirements" and was "Top Purity 99.5%."

E.     **Defendants Misled RediBag about the Source of the Alcohol Used to Manufacture the Sanitizer.**

74.     As discussed above and below, Defendants repeatedly told RediBag that Bersih hand sanitizer was manufactured using U.S. alcohol.  RediBag reasonably believed Defendants and marketed the hand sanitizer on that basis.

75.     In actuality, at least some Bersih hand sanitizer was made completely or partially using Mexican alcohol.  That Mexican alcohol is almost certainly the source of the methanol contamination ultimately discovered in shipments of Bersih sent to RediBag's customers.

76.     The precise sources of the alcohol that Solucionés used to manufacture Bersih remain unclear and likely changed over time.  Both before and during the FDA investigation, Defendants deliberately gave RediBag misleading and incomplete information about the source of the alcohol to lull RediBag into a false sense of security about the safety of Bersih hand sanitizer.

77.     After maintaining for months that they used only U.S. alcohol, the Solucionés Defendants eventually admitted that their initial shipments of alcohol in April 2020 came from a Mexican entity allegedly called "Logistica en Servicio," but provided no bills of lading or other shipping records from that entity.  RediBag has been unable to locate a company by that name.

78.     The Solucionés Defendants did provide bills of lading and other shipment records from Oxy and Quimica Blantex S.A. de C.V. ("Quimica Blantex"), which are both Mexican entities.  Oxy appears to have supplied alcohol to Solucionés from about April 30, 2020 to May 16, 2020, and Quimica Blantex appears to have supplied alcohol to Solucionés from about May 4, 2020 to June 2, 2020.

79.     The Solucionés Defendants have claimed that Oxy was distributing alcohol originally produced by the U.S. company POET in Texas.  However, the Solucionés Defendants

provided no documentation of that assertion.  The Solucionés Defendants likewise failed to provide any evidence that they actually used the Freepoint ethanol described above to manufacture sanitizer.

80.     Given the timing of the contaminated lots of finished hand sanitizer, it is unlikely that the Oxy or Quimica Blantex alcohol contained methanol.  The first contaminated lot of hand sanitizer was manufactured on April 16, 2020, two weeks *before* Solucionés received its first shipment from Oxy.  The overwhelming majority of the most egregiously contaminated lots were manufactured on or before May 3, 2020.

81.     However, the continued presence of methanol (albeit mostly below acceptable limits) in later lots of hand sanitizer indicates that Solucionés likely was mixing the "good" Oxy and Quimica Blantex alcohol with the "bad" alcohol from "Logistica en Servicio" or some other as-yet-identified source.  If Solucionés had only been using the Oxy and Quimica Blantex alcohol starting on April 30, 2020, the methanol content of all subsequently manufactured sanitizer would have been virtually non-existent.  But instead, methanol continued to be present in unexpectedly high quantities in sanitizer lots that Solucionés manufactured throughout May 2020, with a handful of lots containing methanol above acceptable limits.  This fact suggests that Defendants were trying to get rid of the tainted Mexican alcohol by mixing it with the methanol-free alcohol, and occasionally added too much.

82.     In mid-May 2020, RediBag actually asked Defendants if Solucionés had changed alcohol suppliers, because customers suddenly began to complain that the hand sanitizer smelled like a "tequila factory."

83.     Bazbaz acknowledged there had been a switch, but asserted that the change in alcohol was due to a new FDA policy announced April 27, 2020 requiring sanitizer to be made

with denatured alcohol to discourage children from drinking it. Denatured alcohol is more bitter and less appealing to ingest.

84.     In his response to RediBag's inquiry, Bazbaz did not identify the specific alcohol suppliers. Nor did Bazbaz say that Solucionés had used or was using Mexican alcohol, or that the new alcohol was materially different.

85.     To the contrary, Bazbaz assured RediBag that "We did not switch any ingredients…. All ingredients are the same as the ones we initially sent."

86.     Based on Defendants' assurances, RediBag told its customers that the odor is normal and was the result of compliance with the FDA's policy on using denatured alcohol.

87.     A much more likely explanation for the change in alcohol suppliers is that Defendants had realized that the Mexican alcohol they had been using was tainted with methanol. Solucionés then obtained different, methanol-free alcohol, but continued to use up the Mexican alcohol a little at a time by mixing it with the methanol-free alcohol.

   **F.     Defendants Missed Numerous Production Deadlines and Shipped Product Different from the Samples They Provided.**

88.     Starting in April 2020, Defendants blew countless production deadlines and provided incorrect product that differed dramatically from the samples that Defendants provided to RediBag and its customers.

89.     In early April, Manuel Martínez and Bazbaz gave RediBag production forecasts and a proposed schedule for shipping sanitizer to the United States. RediBag told Defendants that it could not wait until April 20 to start receiving sanitizer and that losing even one week would be a major problem. Defendants agreed that they would ship the first truckloads starting on April 13 or 14. Defendants missed that first deadline by several days, and continued to fall further and further behind.

16

90.     On April 28, 2020, Rozinov, pursuant to conversations with Bazbaz, claimed that the Solucionés factory was at capacity.

91.     Nevertheless, shipments of sanitizer were substantially delayed throughout April, May, and June 2020.

92.     By May 6, 2020, shipments were sixteen truckloads behind.  Orders due weeks before had not yet shipped.  RediBag's customers were becoming increasingly frustrated, and told RediBag they could not accept additional delays.  Bazbaz told RediBag that he could not "apologize enough for the delays we have caused."  On June 8, 2020, Solucionés had missed its delivery amounts three weeks in a row.

93.     Solucionés also could not provide samples to customers on a timely basis. RediBag warned that its customers were on the verge of buying hand sanitizer elsewhere.

94.     At the same time, Defendants also were supplying unusable product.

95.     When hand sanitizer at last shipped in April 2020, the caps were so tightly screwed on, they were impossible to remove without pliers.  Replacements did not arrive until May 8, 2020.

96.     Furthermore, as discussed above, numerous customers complained throughout May and June 2020 that the hand sanitizer they had received had a very strong alcohol smell that was nothing like the samples they had received.

### G.     The FDA Raised the Alarm Regarding Mexican Hand Sanitizer Contaminated with Methanol.

97.     On June 19, 2020, the FDA issued an alert warning consumers about the dangers of using hand sanitizer contaminated with methanol.  The alert covered nine hand sanitizers that were manufactured by the Mexican company Eskbiochem.

17

98.     The FDA advised that methanol exposure can result in "nausea, vomiting, headache, blurred vision, permanent blindness, seizures, coma, permanent damage to the nervous system or death."  The FDA specifically identified young children who accidentally ingest sanitizer, as well as adolescents and adults who drink it as a substitute for drinking alcohol, as acutely susceptible.

**H.     Based on Defendants' Representations, RediBag Assured Its Customers that Bersih Was Methanol-Free.**

99.     As a result of the FDA alert, customers began questioning RediBag about the safety of the Bersih hand sanitizer they had purchased.

100.    Relying on Defendants' representations, RediBag told its customers that Bersih hand sanitizer was safe, compliant with FDA requirements, and manufactured with methanol-free ethanol sourced from the United States.

101.    On June 20, 2020, RediBag emailed a letter to customers confirming that Bersih hand sanitizer was not produced by Eskbiochem and was not covered by the FDA's alert.  Based on the information Defendants provided, RediBag also emphasized that Bersih was safe, methanol-free, and made with U.S. ethanol.

102.    The June 20, 2020 letter was also posted to RediBag's website.  RediBag directed several of its customers to the letter.  One customer had specifically reached out to RediBag for confirmation that tests showed Bersih was methanol-free, reattaching the specifications sheet that Solucionés had created and RediBag had forwarded.  Relying on Defendants' misrepresentations, RediBag responded that "our sanitizer is Methanol free" and sent a link to the June 20, 2020 letter.

I.      **The FDA Recommended a Recall of Bersih Hand Sanitizer for Methanol Contamination.**

103.    On July 1, 2020, just a few days after RediBag relied on Defendants' misrepresentations to assure its customers that Bersih was safe, the FDA recommended a recall of: (i) Bersih Hand Sanitizer Gel Fragrance Free; and (ii) Bersih Antiseptic Alcohol 70% Topical Solution hand sanitizer.

104.    On July 2, 2020, the FDA released a press statement reiterating the dangers of methanol and warning consumers that the FDA had seen a sharp increase in hand sanitizer products that are labeled to contain ethanol, but have tested positive for methanol contamination.

105.    On the same day, the FDA also added several Bersih products to the FDA's list of sanitizers that should not be used.  RediBag and Private D were identified in the list as distributors of Bersih.

106.    The addition of Bersih to the FDA's "do not use" list resulted in substantial nationwide media coverage.

J.      **Defendants Continued to Maintain that Bersih Was Manufactured with Pure U.S. Ethanol.**

107.    Despite the FDA's warnings about Bersih, Defendants continued to deny that their hand sanitizer was contaminated and persisted in their claims that Bersih had always been made with pure ethanol sourced from the United States.

108.    Defendants attempted to explain the FDA's actions by admitting that Defendants were aware of a single container of contaminated hand sanitizer shipped to the United States. But, according to Defendants, that shipment was merely a bulk sample container sent by request to a customer in Florida for the sole purpose of testing the sample's viscosity and transparency, and was never meant for retail sale.  Defendants' story was that the bulk sample was manufactured using locally sourced alcohol from Mexico that Solucionés would never use in

products intended for distribution to consumers.  The sample never even entered the United States because it was held at the border for testing.

109.     On July 4 and 5, 2020, in a Whatsapp group chat that included Rozinov, Bazbaz again stated that "not a single bottle sold was made with anything other than the [United States] alcohol."  Bazbaz, acting on behalf of himself, Rozinov, Private D, SBR Quality Products, and the Solucionés Defendants, represented to RediBag that Bersih was methanol-free and invited every one of RediBag's customers to test their bottles.

110.     On July 6, 2020, in an email chain including representatives from RediBag, Rozinov, Bazbaz, Manuel Martínez, David Alí, and Solucionés's attorneys at two prominent U.S. law firms, Bazbaz represented that the only product with high levels of methanol detected was the bulk sample headed to Florida.

111.     In answer to further questions from the attorneys, Manuel Martínez indicated that POET was the U.S. ethanol supplier for Bersih hand sanitizer.

112.     A few days later, Manuel Martínez stated in voice messages to RediBag that the ethanol used was "the most purest ethanol that it could be on the market, it's the best one." Manuel Martínez further insisted that "the thing that we've been telling you guys is the truth and the product we're selling you into the customers and retail stores and everything is ok and the FDA is doing an unethic[al] thing."

113.     Manuel Martínez also stated that he had spent his day in the lab in Mexico City and that "every lot"—250 samples—was being tested.  Based on this alleged testing, Manuel Martínez reported on July 10, 2020 that there were no traces of methanol in any samples.

**K.    RediBag Told Its Customers and the FDA that Bersih Hand Sanitizer Was Not Contaminated.**

114.    After the FDA placed Bersih on the "do not use" list, RediBag was besieged by incensed customers, particularly those that RediBag had assured just weeks earlier that Bersih was safe and fully FDA-compliant.

115.    On July 2, 2020, for example, RediBag was notified that a consumer claiming to have been injured by Bersih sanitizer she bought from Old Navy had been directed by Old Navy's insurance company to make her claim against RediBag.

116.    On July 5, 2020, relying solely on Defendants' misrepresentations and cherry-picked test results, which RediBag had no reason to doubt, RediBag issued a letter to its customers who had purchased sanitizer.

117.    In the letter, RediBag stated that the FDA recall request was based on testing of the single bulk sample, not any retail product, and that "independent third-party testing" showed that the retail product was safe.  The letter further explained that the product was made using FDA-approved alcohol bought in the United States and delivered to Mexico for production.

118.    Despite RediBag's letter, numerous customers clamored to return Bersih.

119.    On July 6, 2020, at Defendants' urging, RediBag also sent a letter to the FDA protesting the FDA's placement of Bersih hand sanitizer on the "do not use" list.

120.    In that letter, RediBag again unwittingly repeated Defendants' misrepresentations that the FDA never tested the retail sanitizer, which was manufactured with "ethanol sourced from a reputable US supplier."  RediBag also attached the "alcohol diligence documents" and other documents selectively provided by Defendants.

121.    The same day, Soluciones's attorneys sent a similar email to the FDA echoing the Defendants' false statements.  The attorneys requested a call with the FDA as soon as possible.

21

      **L.**     **The FDA Revealed that It Had Discovered Multiple Lots of Contaminated Bersih Sanitizer.**

122.    On July 10, 2020, on a call with the FDA, RediBag learned the truth: thousands of bottles of Bersih hand sanitizer were made with Mexican alcohol and were dangerously contaminated with methanol.

123.    David Alí, Manuel Martínez, Santiago Martínez, Rozinov, Soluciones's attorneys, and RediBag participated in the call with the FDA.  The FDA representative asked if Mexican ethanol had been used in Bersih's production.

124.    Directly contradicting Defendants' representations only days earlier—in addition to those repeated throughout April, May, June, and early July 2020—David Alí admitted that Mexican alcohol had been used to make not only the bulk sample sent to Florida, but also two additional truckloads of hand sanitizer.  He also admitted that some sanitizer produced prior to May 2, 2020 used Mexican alcohol, but claimed that all sanitizer produced after May 2, 2020 used U.S. alcohol.

125.    The FDA responded that two lot numbers of Bersih, at least one of which was produced after May 2, 2020, had tested at over 30 percent methanol and 2 percent methanol, many times greater than the acceptable limit of .063 percent methanol.  The FDA also disclosed that it had opened investigations into two tragedies allegedly related to Bersih.  One person had died, and another was facing permanent blindness.  Expressing serious doubts regarding Solucionés's controls, the FDA recommended a full recall of all Bersih products.

126.    Later on July 10, 2020, the FDA issued an import alert for all Bersih products.

127.    In the days following the FDA call, Rozinov and Bazbaz attempted to deflect blame onto the Solucionés Defendants.  Bazbaz stated in a Whatsapp message to Rozinov and

RediBag that "They just wanted the business really bad at the beginning and risked Everything on 6 trucks."

**M.    Solucionés Finally Recalled Bersih Products.**

128.    In an effort to preserve the profits gained through their misrepresentations, the Solucionés Defendants continued to maintain that only a handful of lots of sanitizer were contaminated by methanol.  These, they argued, should be the only ones recalled.

129.    Eventually, at the urging of its attorneys, Solucionés issued a recall for all Bersih products on the market on July 14, 2020.

130.    RediBag immediately and repeatedly demanded that Defendants replace all recalled products, and revoked its acceptance of all recalled products.

**N.    Additional Testing Showed Widespread Contamination of Bersih.**

131.    The day after the recall, Defendants for the first time admitted and turned over evidence that the contamination was widespread.

132.    On July 15, 2020, Defendants provided a spreadsheet showing that nearly ***700,000*** bottles of sanitizer were contaminated.  These lots were contained in 65 truckloads, not the two that David Alí mentioned during the July 10, 2020 FDA call.

133.    This spreadsheet was the first RediBag had heard of "Logistica en Servicio," the Mexican company Defendants blamed for the methanol contamination.

134.    The spreadsheet also showed that hand sanitizer with toxic and elevated levels of methanol continued to be manufactured and shipped out throughout May 2020, at least as late as May 24, 2020.

135.    David Alí's claim during the FDA call that all Bersih hand sanitizer was made using pure U.S. alcohol after May 2, 2020 was clearly false.  Moreover, as discussed above, even if Bersih hand sanitizer was being made partially with U.S. alcohol after May 2, 2020, the only

plausible explanation for the tainted lots is that Solucionés was cutting the U.S. alcohol with the Mexican alcohol, which Solucionés was still trying to use up.

**O.     RediBag's Customers Demanded Action as a Result of the Recall.**

136.    The fallout from the recall was swift and severely injurious to RediBag's relationships with its customers.

137.    Some customers indicated willingness to accept replacement product.  But over the course of the next month, others rejected the possibility of cure in the first instance and demanded refunds or returns for credit for the tainted product.

138.    Unsurprisingly, the effects of Defendants' deception extended well beyond RediBag.  Distributors and grocery chains, which ultimately serve consumers, informed RediBag not only of damaged relationships with their own customers, but fear for the end users.

139.    In an email to RediBag on July 31, 2020, for example, one customer informed RediBag it had already been forced to buy hand sanitizer not made in Mexico and noted that Solucionés's product "could have potentially killed people."  Another customer expressed concern about the "potential toxic nature of the product."

**P.     Defendants Agreed to Refund or Replace Tainted Hand Sanitizer.**

140.    After Solucionés issued its notice of voluntary recall, the parties reached agreement regarding (i) how to retrieve the tainted hand sanitizer from RediBag's customers; and (ii) how to address customers' demands for refunds for Bersih, replacements for Bersih, or both.

141.    As a first step, RediBag suggested that Solucionés employ a company specializing in the pickup of the tainted product.  Defendants hired Stericycle Co. ("Stericycle") to retrieve tainted hand sanitizer from RediBag's customers.

142.    Shortly thereafter, Defendants and RediBag held a series of meetings and exchanged correspondence to discuss refunds and replacements.

143. On July 16, 2020, Manuel Martínez informed RediBag that Solucionés would replace the sanitizer, stating that "we all can agree that the cleanest way out of [the debacle caused by the recall] for all is a free replacement." Defendants previously had agreed to refund customer's money. RediBag accepted Defendants' offer to replace the sanitizer or to issue refunds.

144. On July 17, 2020, pursuant to queries from customers regarding the plan for the recall, the Solucionés Defendants sent a letter to RediBag with the understanding that RediBag would convey the letter to its customers. In it, Solucionés stated:

> The purpose of this letter is to state that Solucionés Cosmeticas commits to replace the product that is subject of this voluntary recall requested by FDA. The new product will meet specifications required by FDA. Further details on how and where to return the recalled product will be given as soon as it is agreed upon.

145. By early August 2020, RediBag's customers were angry and demanding the details promised in the July 17 letter.

146. Stericycle, employed solely by Solucionés, was not responsive and customers' tainted sanitizer had not been retrieved. Despite Defendants' reassurance that pickup was imminent, RediBag's customers remained saddled with contaminated product for months. Stericycle did not affirmatively reach out to RediBag's customers, and instead waited for the customers to contact Stericycle. Stericycle also refused to tell RediBag when or from which customers sanitizer had been retrieved.

147. Defendants also failed to provide sufficient recall instructions. As one customer pointed out, the recall instructions seemed to pertain only to consumers, not to distributors and retailers.

148. In August 2000, RediBag, Solucionés, and Private D agreed to replacement and refund options. Specifically, the parties agreed that Defendants would provide (i) replacement

Mexican-made hand sanitizer, in a quantity ten percent more than originally purchased to entice

customers now wary of Mexican product, or (ii) replacement U.S.-made hand sanitizer. The

parties also agreed that if customers refused to accept replacement sanitizer, Defendants would

pay refunds. In addition, the parties agreed that customers could choose a mix of replacement

product and refunds, and that certain long-time RediBag customers would receive tailored deals.

149.    Defendants subsequently breached these agreements, severely damaging both

RediBag and its customers.

150.    The agreements were memorialized in a writing dated August 13, 2020 (the

"August 13 Agreement"). In pertinent part, the August 13 Agreement read:

> We previously requested that Redi Bag notify its customers of [the] recall,
> which we understand it has done….
>
> Solucionés retained Stericycle to manage return of all recalled product and
> we understand that Redi Bag's customers are working to return product
> through Stericycle.
>
> Solucionés anticipates that Redi Bag's customers will make recall claims
> to Redi Bag for product that those customers return to Stericycle as
> instructed in Solucionés' notice. Solucionés will work with Redi Bag to
> resolve those recall claims using the below options:
>
> - Solucionés Cosmeticas will replace all product (100%)
>   that each Redi Bag customer returns to Stericycle,
>   including product returned by downstream customers;
>   or
>
> - Solucionés Cosmeticas will reimburse Redi Bag for all
>   product that each Redi Bag customer returns to
>   Stericycle, including product returned by those
>   downstream of RediBag's customers, at the rate of
>   $30.00 per case (twelve 16.9-ounce bottles).
>
> Depending on each customer's requirements, Solucionés Cosmeticas can
> also combine product replacement and reimbursement remedies as
> outlined above to ensure Redi Bag's customers receive value for each
> product returned to Stericycle.

> To be an eligible claim, Redi Bag must present to Solucionés the claim of its customer setting forth the amount of product returned to Stericycle, the amount of returns by downstream customers claimed. We attach a form that captures information needed by Solucionés to resolve these claims. To the extent the Redi Bag customer seeks reimbursement for returned product, Solucionés and Redi Bag will fund the claim from the Escrow Account.

151.    In sum, Solucionés agreed to replace the product, pay refunds, or a combination of both.  Solucionés also agreed that any claims for reimbursement that customers submitted to RediBag would be funded through an escrow account paid for by Defendants.

152.    RediBag's agreement to the options set forth in the August 13 Agreement is evidenced by the fact that RediBag provided the August 13 Agreement to all of its customers that had purchased sanitizer and attached a letter informing them that RediBag was exercising its right to cure.

153.    Defendants repeatedly confirmed the terms of the agreement.  On September 1, 2020, for example, RediBag sought clarification on the status of the U.S.-made replacement sanitizer option.  In response, Santiago Martínez asked, "You are talking about *the 3 options we are offering* right?  In which the first should be Klinare replacement, with the [incentive for 10 percent more product than customers were originally provided and the] second should be US replacement and third should be 30 USD reimbursement?"  RediBag responded "*correct*."

154.    In fall 2020, Manuel Martínez and Santiago Martínez traveled to RediBag's offices in New York to discuss replacement products and Defendants' alleged difficulty obtaining funding for the promised customer refunds.  David Alí also had multiple calls with RediBag reiterating the agreed-on replacement and refund options and asking RediBag to put him in contact with RediBag's bank for potential help with financing.

**Q.     Defendants Failed to Provide and Made Misrepresentations about the Replacement Sanitizer.**

155.    As set forth above, shortly after the FDA revealed the methanol contamination, the parties agreed that Defendants would be providing both U.S.-manufactured and Mexican-manufactured replacement sanitizer options.

156.    Defendants were well aware of the urgent need to replace the sanitizer to preserve RediBag's reputation with its customers and allow RediBag to exercise its right to cure. Defendants also were aware that RediBag was depending on Defendants to provide details about the replacement sanitizer that RediBag could in turn pass on to its customers.

157.    Defendants' misstatements to RediBag about the status of Defendants' effort to secure replacement product and failure to meet even their own deadlines throughout 2020 and 2021 caused RediBag to suffer massive damages.

158.    In the end, after months of delay and false statements regarding timing and production capabilities, Defendants have provided no Mexican-made replacement sanitizer and only one truckload of U.S.-made replacement sanitizer.  As a result, RediBag has been forced to purchase its own replacement sanitizer and to pay massive refunds to customers.

**1.     Mexican-Made Replacement Sanitizer**

159.    On July 20, 2020, the Solucionés Defendants provided RediBag with a specification sheet, proposed label, and safety data sheet for a replacement product manufactured in Mexico: Klinare.  Eager to furnish its customers with replacement product as soon as possible, RediBag immediately requested a sample, as well as a timeline.  RediBag explained to Defendants that customers need product replaced "now not later … later is no good."

160.    On July 21, 2020, Manuel Martínez informed RediBag that Solucionés could start shipping packaged Klinare in less than ten days and that all twenty to thirty truckloads of

28

replacement product could be manufactured in two to three days.  Neither of these statements was true.  RediBag relied on the statements to provide timing estimates to its customers.

161.    Although the Solucionés Defendants stated that Solucionés could begin shipping Klinare by July 31, 2020, Solucionés did not even provide sample shipping labels or sample product until August.

162.    On August 4, 2020, the need for the missing labels and samples became more urgent for RediBag and its customers because the FDA returned Solucionés's deception to the public spotlight.  The FDA issued a public warning letter to David Alí demanding, among other things: (i) a detailed investigation into how Solucionés's hand sanitizer became contaminated; and (ii) a list of all raw materials, including the suppliers' names, addresses, and contact information.

163.    As of August 6, 2020, the Solucionés Defendants still had not provided any samples of Klinare for RediBag to approve and send to customers.  Concerns regarding missing samples became more worrisome three days later, on August 9, 2020, when Solucionés was forced to update its recall information to include additional information widening the scope of the recall.

164.    Although RediBag eventually received samples on August 18, 2020, the samples were spoiled by leaks and thus not suitable to provide to customers.

165.    On August 18, 2020, Manuel Martínez gave RediBag a new timeline for shipping Klinare.  He provided a graph on Solucionés-labeled paperwork clearly setting forth both the amount of Klinare ready to ship and shipping deadlines.  In the timeline, Solucionés guaranteed delivery beginning on September 5, 2020 and ending on September 11, 2020.  The timeline again

misrepresented Defendants' capacity to produce and ship Klinare, in an apparent bid to assuage RediBag's mounting concerns.

166.     RediBag again relied on the statements to provide timing estimates to its customers.  In August and September 2020, RediBag customers ordered more than 170,000 bottles of Klinare to replace the contaminated sanitizer.

167.     On September 4, 2020, RediBag informed Santiago Martínez and Manuel Martínez that new samples of Klinare still had not arrived.  Santiago Martínez informed him that samples were en route but were still at the border entry point in Laredo, Texas.

168.     On September 15, 2020, more than two months after the recall, RediBag finally received replacement samples that it could provide to customers.

169.     After RediBag approved the samples, the production schedule was again delayed.  On September 29, 2020, Manuel Martínez represented that the first 178,000 units were slated to be shipped on October 16, 2020.  This did not occur.

170.     By the time Defendants may have been able to begin delivering Klinare, virtually all of the orders for Klinare from RediBag's customers had been cancelled due to Defendants' delay.  Ultimately, Defendants provided no Mexican-made sanitizer.  As a result, RediBag was unable to fill the orders from RediBag's customers for Klinare sanitizer.

### 2.      U.S.-Made Replacement Sanitizer

171.     A similar narrative unfolded with the U.S.-made replacement sanitizer.

172.     Defendants knew and agreed that having a U.S.-manufactured option was crucial to rebuilding trust with RediBag's customers.  Three days after the voluntary recall notice, on July 17, 2020, Manuel Martínez emailed RediBag, volunteering that, "I can inform you that We are working on a U.S. alternative actualy this alternative is realy advanced and we think its the

best way yo go for everyones interest [sic]."  Manuel Martínez promised additional information soon.  RediBag stated that this was "good news" that would "go a long way" with its customers.

173.    On July 19, 2020, Manuel Martínez again assured RediBag that U.S.-made hand sanitizer was one of the options for replacement that Solucionés had agreed to provide.

174.    In the email attaching the August 13 Agreement, Manuel Martínez told RediBag that information on options for U.S.-made replacement sanitizer would be forthcoming shortly.

175.    After further delay following the August 13 Agreement, Solucionés provided specifications to RediBag for two U.S.-manufactured sanitizers: Pristine and Phytoclean. RediBag opted for Pristine as an appropriate replacement.

176.    On or around August 17, 2020, Defendants provided a timeline for production and shipping of Pristine, representing that the first three deliveries of 33,000 units each would occur on August 26, 27, and 28, 2020.

177.    Again, this timeline misrepresented production and shipping capacities, and RediBag relied on the misrepresentations to provide timing estimates to customers.  In September 2020, RediBag customers ordered more than 400,000 bottles of Pristine to replace the contaminated sanitizer.  Ultimately, all of these orders were cancelled because Defendants could not deliver the product.

178.    Defendants did not come close to meeting their own schedule.  As was the case with Klinare, samples of Pristine were exceedingly difficult to extract from Defendants.  As of September 4, 2020, Defendants were unable to provide even a tracking number for such samples, if indeed they had shipped.  RediBag did not receive samples until September 18, 2020.

179.    On September 25, 2020, RediBag was surprised to learn by Whatsapp that Pristine was not yet even in production.

180.     On September 30, 2020, Bazbaz sent an email entitled "Pr[i]stine Update" to RediBag, copying Manuel Martínez, Santiago Martínez, and Rozinov, informing RediBag that Martínez would be traveling to California to "close the deal targeting to begin production next week."  Once production started, he explained, "as shared before on production times, full production will take 15 days."  During the pendency of that time, he stated, the Solucionés Defendants "could send a truck out every couple days."  Each of these statements about production capabilities and timing was false.

181.     On October 1, 2020, RediBag requested another status update regarding Pristine, and was again told production would commence shortly.  It did not.

182.     Instead, on October 9, 2020, Bazbaz and the Solucionés Defendants brazenly informed RediBag that they had *never* agreed to provide U.S.-made hand sanitizer.

183.     Defendants soon reversed course again.  On October 29, 2020, Manuel Martínez informed RediBag that the Solucionés Defendants intended to assemble "a formal proposal to supply replacement product with US made hand sanitizer."

184.     More than two weeks later, on November 18, 2020, Manuel Martínez agreed that the Solucionés Defendants would provide safe and appropriate U.S.-made hand sanitizer samples.  On November 29, 2020, samples had yet to arrive.

185.     In November and December 2020, RediBag attempted to mitigate its damages by independently purchasing 350,000 bottles of replacement sanitizer for one customer that could wait no longer for Defendants to abide by the August 13 Agreement.  RediBag paid more than $670,000 for the replacement sanitizer.  In addition, RediBag and the customer agreed that the customer could return any unused replacement product for a refund after six months.  Such a condition would not have been necessary if Defendants had provided replacement sanitizer in

32

August or September 2020 as they had agreed, but by November 2020 the demand and price for sanitizer had significantly decreased due to a glut in the market.

186.    Throughout 2021, Defendants have continued to make false statements to RediBag regarding the availability of U.S.-made replacement hand sanitizer.  In particular, Defendants repeatedly have misrepresented that product either was in production or en route to RediBag's customers, neither of which proved to be true.  RediBag relied on such misrepresentations in its communications with customers.

187.    In early 2021, Defendants abandoned Pristine.  Solucionés hired a new U.S. manufacturer to make replacement sanitizer, this time under the name Phyto.

188.    On February 2, 2021, Manuel Martínez informed RediBag that the new U.S. manufacturer was ready to produce 200,000 bottles.  At that time, some of RediBag's customers remained willing to accept small amounts of replacement sanitizer and ordered about 100,000 bottles of Phyto from RediBag.  Shortly thereafter, RediBag sent Solucionés purchase orders for the replacements.  Based on Defendants' representations, RediBag also informed at least one customer that replacement sanitizer was on its way.

189.    A month later, no replacement sanitizer had arrived.  When queried, Manuel Martínez informed RediBag that no bottles had yet even entered production, meaning that the manufacturer had not, in fact, been ready to produce 200,000 bottles.  Instead, Manuel Martínez explained, raw materials were supposedly on the way to the manufacturer.  The Solucionés Defendants guaranteed delivery of these bottles by the end of March 2021.

190.    After numerous messages from RediBag, which was anxious to ensure that Solucionés would abide by its commitments, Manuel Martínez informed RediBag on March 22,

2021, that manufacturing still was not occurring because the manufacturer changed facilities entirely.

191.    Nevertheless, Manuel Martínez promised, delivery would be on time.  On March 25, 2021, Manuel Martínez again informed RediBag that the shipment was on schedule.

192.    By March 31, 2021, RediBag's customer had not received any replacement sanitizer.  On April 1, 2021, Manuel Martínez informed RediBag that the manufacturer was having difficulties and the customer would receive 100,000 units the following week.  According to Martínez, Bazbaz was would coordinate shipping in the United States.

193.    On April 7, 2021, delivery still had not occurred.  Manuel Martínez explained that Defendants were having a disagreement with the manufacturer.  In response, RediBag summed up this representation—another in a long line of pretexts—as "incredible."

194.    Finally, in July 2021, Defendants delivered two truckloads of Phyto sanitizer to RediBag's warehouse.

195.    On July 9, 2021, Bazbaz wrote to RediBag about the two truckloads, stating that "We've payed [sic] for freight in the past and will Continue to do so as per our agreement."

196.    Bazbaz arranged for SBR Quality Products to wire the freight payment to RediBag a few days later.

197.    RediBag accepted the Phyto sanitizer so that it would be able to provide it to any customer willing to accept replacement sanitizer rather than cash refunds.  So far, the Phyto sanitizer is still sitting in RediBag's warehouse.

**R.    Many RediBag Customers Have Taken the Position that RediBag Has Lost Its Right to Timely Cure.**

198.    In the fall and winter of 2020, many customers took the position that RediBag could no longer timely cure due to excessive delays.

34

199.    For example, on September 21, 2020, one RediBag customer informed RediBag that the window had closed for RediBag to cure the defect.

200.    On October 8, 2020, at least two major RediBag customers indicated that they were no longer willing to allow RediBag to cure because Defendants had not delivered replacement sanitizer.

201.    The next day, another major RediBag customer informed RediBag that it was "done" waiting.  Three days later, the customer cancelled nine orders with RediBag for replacement sanitizer.

202.    On December 3, 2020, Miller's Supplies at Work ("Miller's") informed RediBag that the time for cure had passed.  Shortly thereafter, Miller's filed suit against RediBag.

203.    While some customers continued to negotiate with RediBag about voluntarily accepting replacement sanitizer in lieu of cash, those customers have maintained that they are not *required* to do so.  In any event, until July 2021, RediBag had no replacement sanitizer to provide to its customers, other than the replacement sanitizer it went out and bought itself.

**S.      Defendants Also Violated Their Agreement to Pay Refunds to RediBag Customers.**

204.    As discussed above, Defendants agreed to pay cash refunds of $30 per case to any RediBag customers who requested such a refund.  They further agreed to fund an escrow account to pay such refunds.

205.    As discussed below, RediBag's customers have demanded millions of dollars of refunds.  Despite these demands and Defendants' explicit agreement that Solucionés would deposit $500,000 into the escrow account, Solucionés has placed only $100,000 into the escrow account.

T.    **RediBag Has Suffered Millions of Dollars of Damages Due to Defendants' Misconduct.**

206.    In addition to severely damaging RediBag's reputation and its relationships with its customers, Defendants' misconduct has cost RediBag well over $10 million.

207.    In an attempt to mitigate its damages, RediBag has paid its customers millions of dollars of refunds out of RediBag's own pocket.

208.    Furthermore, as discussed above, RediBag also tried to mitigate its damages by independently purchasing more than $670,000 of replacement sanitizer, which RediBag provided to one of its customers.

209.    In addition, some customers have made unilateral deductions from RediBag invoices for non-sanitizer products, purportedly to reimburse the customers for the amounts they paid for Defendants' contaminated sanitizer.  Those deductions currently total millions of dollars.

210.    On top of these payments and deductions, customers have made additional claims totaling several million dollars against RediBag for Defendants' contaminated sanitizer.  Miller's already has filed suit against RediBag, claiming more than $125,000 in damages.

211.    RediBag also lost millions of dollars of profit on the more than 1.5 million bottles of sanitizer that have been returned.

212.    RediBag likewise has incurred hundreds of thousands of dollars in legal fees and employee time to handle matters related to the sanitizer recall and its aftermath.

<u>COUNT I:  RACKETEERING INFLUENCE AND</u>
<u>CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(C)</u>

**(Against All Defendants)**

213.    RediBag re-alleges and incorporates by reference all preceding paragraphs.

214.     At all relevant times, RediBag and all Defendants were "persons" under 18 U.S.C. § 1961(3) because they were individuals or entities capable of holding a legal or beneficial interest in property.

## Enterprise

215.     The SBR Enterprise constituted an ongoing and continuing association-in-fact consisting of legal individuals and entities, including each of the Defendants.

216.     The SBR Enterprise has an existence separate and distinct from each Defendant.

217.     The existence of the SBR Enterprise is confirmed by the collaboration of Defendants in the manufacturing, sale, marketing, labeling, testing, bottling, shipping, export, import, receiving, processing, and distribution of hand sanitizer and other home and personal care products, as documented in conference calls, email chains, Whatsapp group messages, and in-person meetings.

218.     The individual Defendants—Rozinov, Bazbaz, Saba, David Alí, Manuel Martínez, and Santiago Martínez—have close personal and business relationships stretching back many years.  Rozinov, Bazbaz, and Saba are all principals of SBR Quality Products, which is the holding company they set up, along with Private D, to sell Mexican products in the United States.  Rozinov, Bazbaz, and Saba also co-founded and share other companies.  Saba, Bazbaz, Manuel Martínez, and Santiago Martínez have known each other at least since their time together at Universidad Iberoamericana.  David Alí, Manuel Martínez, and Santiago Martínez are members of the same family and all hold key positions at Solucionés.  Until recently, David Alí was an officer and owner of Solucionés, and his company Euro Cosmetics owns the warehouse in Laredo, Texas that imports, stores, and distributes products from Solucionés.  Saba and Bazbaz likely used Solucionés as a "maquila," financing the production of hand sanitizer and

other products to be imported to the United States under Solucionés's existing brands and/or permits.

219.    The individual Defendants control, operate, use, and are the direct, beneficial, and/or equitable owners of the entity Defendants—SBR Quality Products, Private D, Solucionés, and Euro Cosmetics.

220.    The SBR Enterprise is engaged in, and its activities affect, interstate commerce. The SBR Enterprise is conducting and has conducted commercial activities across state and international lines, including the sale, marketing, labeling, testing, bottling, shipping, export, import, receiving, processing, and distribution of hand sanitizer and other home and personal care products from Mexico to and throughout the United States, as well as the corresponding receipt of money from the sale of those products.

221.    The SBR Enterprise functions as a continuing unit with the common purpose of profiting through the importation and sale in the United States of hand sanitizer and other home and personal care products manufactured in Mexico.  By manufacturing the products in Mexico and using a well-established U.S. company like RediBag to distribute the products to its existing customer network, the SBR Enterprise can avoid the consequences of misrepresenting the source and quality of the products and violating U.S. laws governing such products.  RediBag has been left to answer its customers' demands for refunds and replacement products while the SBR Enterprise continues to make money with new products and business ventures.

**Conduct**

222.    Each of the Defendants is employed by or associated with the SBR Enterprise. Each of the Defendants directly and indirectly conducted and participated in the operation or management of the SBR Enterprise.

223.    Bazbaz, Saba, and the Solucionés Defendants financed and directed the manufacture of products in Mexico, including overseeing ethanol sourcing.  Manuel Martínez and Santiago Martínez were the plant managers for Solucionés.  David Alí was the President of both Solucionés and Euro Cosmetics and took a lead role in negotiations with the FDA.  Bazbaz visited the Solucionés factory to monitor production and consult with the Solucionés Defendants.

224.    The Solucionés Defendants coordinated with Bazbaz and Rozinov regarding marketing, branding, label design, packaging, product specifications, samples, and testing.

225.    The Solucionés Defendants, Euro Cosmetics, Bazbaz, Rozinov, Private D, and SBR Quality Products also each played key parts in shipping and distributing products, working together to navigate customs and import products from the Solucionés factory in Mexico to the Laredo, Texas warehouse of Euro Cosmetics, and then delivering the products around the United States.  Private D was identified as the consignee of the products on customs paperwork.

226.    At various times, Bazbaz (acting on behalf of himself, Private D, SBR Quality Products, and/or Solucionés), Rozinov (acting on behalf of himself, Private D, SBR Quality Products, and/or Solucionés), Manuel Martínez (acting on behalf of himself and/or Solucionés), Santiago Martínez (acting on behalf of himself and/or Solucionés), and David Alí (acting on behalf of himself, Solucionés, and/or Euro Cosmetics), each communicated with RediBag about the quality and source of the products, packaging, labeling, samples, testing, production and shipping timelines, customs, and distribution.

227.    Bazbaz, Saba, Rozinov, Private D, and the Solucionés Defendants worked together to obtain and forward to RediBag doctored forms and cherry-picked testing results to convince RediBag and its customers to purchase products from the SBR Enterprise.

228.     Rozinov, through Private D, planned and orchestrated the financial arrangements among the parties.  Private D invoiced RediBag for the SBR Enterprise's products and RediBag paid Private D over $9 million for those products.

## Pattern of Unlawful Racketeering Activity

**A.      Predicate Acts – Wire Fraud, 18 U.S.C. § 1343**

229.     Each of the Defendants agreed to and did conduct and participate in the conduct of the SBR Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding RediBag.

230.     Each of the Defendants has committed at least two of the predicate acts discussed below.

231.     Each of the Defendants has committed wire fraud pursuant to 18 U.S.C. § 1343.

232.     Each of the Defendants devised and intended to devise a scheme and artifice to defraud RediBag and to obtain money and property through false and fraudulent pretenses, representations, and promises.

233.     Each of the Defendants transmitted or caused to be transmitted, by means of wire, radio, or television communication in interstate or foreign commerce, writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

234.     In the paragraphs above, RediBag has identified numerous wire communications sent in interstate or foreign commerce that furthered Defendants' fraudulent scheme.  Other fraudulent wire communications occurred, but the specific details of such communications are not known because they are in the possession, custody, and control of Defendants.

235.     Categories of wire communications that furthered Defendants' fraudulent scheme include the following:

236.    From on or around March 22, 2020, to the end of June 2020, Rozinov, Bazbaz, Saba, David Alí, Manuel Martínez, Santiago Martínez, Private D, SBR Quality Products, and Solucionés knowingly sent or caused to be sent electronically dozens of email, text, and telephone communications to RediBag that contained misrepresentations that all of the Bersih hand sanitizer marketed and sold to RediBag's customers and end consumers was compliant with FDA regulations, that the alcohol used to make the hand sanitizer was pure ethanol, and that the ethanol was sourced from the United States.  Some such communications included the official-looking but misleading and surreptitiously altered "alcohol diligence" documents provided by Saba and Bazbaz.

237.    Each such wire communication, as well as each related wire communication that helped facilitate Defendants' fraudulent scheme (such as wire communications solely among Defendants), is a fraudulent wire communication.

238.    In fact, large quantities of Bersih sanitizer were not compliant with FDA regulations, were not made with pure ethanol but with alcohol adulterated with unsafe, potentially lethal levels of methanol, and were not made with ethanol sourced from the United States, but rather from Mexico.

239.    As was intended by Defendants and integral to the SBR Enterprise's common purpose to profit from hand sanitizer sales in the United States, RediBag reasonably relied on Defendants' false statements and so-called "alcohol diligence" documents and passed them on to multiple customers that had purchased and/or subsequently purchased Bersih sanitizer.  Those customers in turn relied on Defendants' false statements and so-called "alcohol diligence" documents.

240.    Even after the FDA recommended a recall of Bersih sanitizer on July 1, 2020, until at least mid-July 2020, Rozinov, Bazbaz, Saba, David Alí, Manuel Martínez, Santiago Martínez, Private D, and Solucionés continued knowingly to send or cause to be sent electronically numerous email, telephone, and text communications containing misrepresentations that all Bersih hand sanitizer sold for consumer use was manufactured exclusively using ethanol sourced from the U.S. company POET, that the sanitizer was entirely compliant with U.S. requirements, and that any methanol contamination was limited to one bulk sample of sanitizer that was not intended for public consumption.  Such communications were sent to RediBag, the FDA, and Defendants' own attorneys, and included the July 10, 2020 call among the FDA, David Alí, Manuel Martínez, Santiago Martínez, Rozinov, Defendants' attorneys, and RediBag.  Some such communications included cherry-picked test results to support Defendants' misrepresentation that there were no traces of methanol in any sanitizer sent to RediBag's customers or end consumers.

241.    Each such wire communication, as well as each related wire communication that helped facilitate Defendants' fraudulent scheme (such as wire communications solely among Defendants), is a fraudulent wire communication.

242.    In fact, a significant quantity of Bersih sanitizer was manufactured using methanol-laced ethanol sourced from Mexico, and further testing by the FDA and Defendants themselves demonstrated that nearly *700,000* bottles of sanitizer contained dangerously high levels of methanol that did not comply with U.S. requirements.

243.    As was intended by Defendants and integral to the SBR Enterprise's common purpose to profit from hand sanitizer sales in the United States, before RediBag was aware of the widespread methanol contamination, RediBag reasonably relied on Defendants' false statements

and cherry-picked test results and repeated the false statements to customers that had purchased Bersih sanitizer. Those customers in turn relied on Defendants' false statements. RediBag also repeated the false statements in a letter to the FDA protesting the FDA's recommended recall of Bersih.

244.   Between April 17, 2020 and June 29, 2020, Private D issued approximately 75 invoices to RediBag, each of which furthered Defendants' fraudulent scheme by ensuring that Defendants would be paid for the sanitizer even though they knew that a significant quantity of the sanitizer was contaminated. On the basis of Defendants' false statements about the quality and source of the sanitizer, RediBag paid the invoices by wire between April 21, 2020 and July 1, 2020. RediBag paid a total of $9,113,851.36 for hand sanitizer.

245.   Each of these invoices and wire payments, and each wire communication associated with the issuance and/or payment of the invoices, is a fraudulent wire communication.

246.   In addition, Rozinov, Bazbaz, David Alí, Manuel Martínez, Santiago Martínez, Private D, SBR Quality Products, Solucionés, and Euro Cosmetics knowingly sent or caused to be sent electronically hundreds of email, telephone, and text communications that furthered the fraudulent scheme by coordinating the manufacturing, sale, marketing, labeling, testing, bottling, shipping, export, import, receiving, processing, and distribution of the sanitizer associated with those invoices.

247.   Each such wire communication is a fraudulent wire communication.

248.   After the widespread contamination of the sanitizer had been revealed in mid-July 2020, until at least October 2020, Rozinov, Bazbaz, Manuel Martínez, Santiago Martínez, Private D, SBR Quality Products, and Solucionés knowingly sent or caused to be sent electronically dozens of email, telephone, and text communications to RediBag that contained

misrepresentations about Defendants' capacity to produce and ship Mexican-made replacement sanitizer, including misrepresentations about Klinare brand sanitizer, the manufacturing facilities available to Defendants in Mexico, and how many bottles the Mexican facilities were readily capable of producing.

249.    Each such wire communication, as well as each related wire communication that helped facilitate Defendants' fraudulent scheme (such as wire communications solely among Defendants), is a fraudulent wire communication.

250.    In fact, contrary to their misrepresentations, Defendants had no capacity to produce and ship Mexican-made replacement sanitizer, and have provided no such Mexican-made replacement sanitizer.

251.    From mid-July 2020 until at least March 2021, Rozinov, Bazbaz, Manuel Martínez, Santiago Martínez, Private D, SBR Quality Products, and Solucionés knowingly sent or caused to be sent electronically dozens of email, telephone, and text communications to RediBag that contained misrepresentations about Defendants' capacity to produce and ship U.S.-made replacement sanitizer, including misrepresentations about Pristine brand sanitizer, Phyto brand sanitizer, the manufacturing facilities available to Defendants in the United States, whether such sanitizer was actually in production at the time of the misrepresentations, and how many bottles the U.S. facilities were readily capable of producing.

252.    Each such wire communication, as well as each related wire communication that helped facilitate Defendants' fraudulent scheme (such as wire communications solely among Defendants), is a fraudulent wire communication.

253.    In fact, contrary to Defendants' misrepresentations, no U.S.-made sanitizer was in production and the U.S. facilities were not equipped to produce the volume of bottles that

Defendants stated.  Defendants have provided only two truckloads of U.S.-made replacement sanitizer.

254.    As was intended by Defendants and as was integral to the SBR Enterprise's common purpose to profit from hand sanitizer sales in the United States, RediBag reasonably relied on Defendants' false statements to provide timelines to its customers regarding the delivery of Klinare, Pristine, and Phyto replacement sanitizer, and RediBag's customers reasonably relied on Defendants' false statements to order replacement product.

**B.      Relatedness**

255.    The predicate acts committed by Defendants are "related" for purposes of establishing a pattern of racketeering activity because the predicate acts were intended to facilitate and advance the SBR Enterprise's common purpose and are related both to each other and to the SBR Enterprise.

256.    The predicate acts have (i) similar purposes, including misleading RediBag regarding the source and quality of the hand sanitizer and the availability of hand sanitizer and replacement hand sanitizer, (ii) similar victims, including RediBag, its customers, and consumers; (iii) the same participants, including Defendants; and (iv) similar methods of commission, including electronic and telephonic communications.

**C.      Continuity**

257.    The predicate acts committed by Defendants are "continuous" for purposes of establishing a pattern of racketeering activity because those predicate acts have taken place over at least 22 months, from no later than March 2020 until now.  Moreover, Defendants' racketeering behavior is substantially likely to continue indefinitely.

45

258.    Over the last 22 months, Defendants have engaged in a complex, multifaceted scheme to profit off of the sale and importation of Mexican products in the United States through coordinated criminal misrepresentations about the safety, quality, and source of the products.

259.    Defendants have committed hundreds of predicate acts of wire fraud.  Those predicate acts have required the active participation of each individual Defendant, as well as the entity Defendants and other companies the individual Defendants have created and used to advance their fraudulent scheme and facilitate the SBR Enterprise.

260.    There are innumerable victims of Defendants' fraudulent scheme, including RediBag, RediBag's customers, and the consumers who purchased contaminated hand sanitizer. The extent of the economic damage has been enormous.  RediBag alone has suffered more than ten million dollars of monetary damage.

261.    In addition, there is a substantial threat that Defendants will continue to commit predicate acts and that their racketeering activity will recur in the future.

262.    The repetitive, continuous nature of Defendants' predicate acts show that such predicate acts are the SBR Enterprise's regular way of doing business.

263.    Defendants attempted to cover up their use of methanol-laced ethanol from Mexico by doctoring the "alcohol diligence" documents and trying to get rid of the methanol-laced ethanol by mixing it with methanol-free ethanol.  Even when Defendants were caught red-handed by the FDA, they continued to lie to RediBag, the FDA, and Defendants' own lawyers.

264.    After Defendants were forced to recall the sanitizer, they misrepresented the status of the production of replacement sanitizer and their capacity to provide such replacement sanitizer.   Such misrepresentations are still occurring.

265.    Defendants are highly likely to continue to commit predicate acts in the future, both to conceal and avoid the consequences of the contaminated sanitizer, and to profit from the next low-quality and potentially dangerous product they attempt to import into the United States.

### RICO Injury

266.    As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), RediBag has been injured in its property in that it has suffered monetary damages of more than $10 million.

267.    Such damages include (a) refunds RediBag has paid to its customers out of its own pocket, (b) the cost of purchasing replacement sanitizer due to Defendants' failure to provide replacement sanitizer, (c) unilateral deductions RediBag's customers have taken from its invoices for non-sanitizer products, (d) additional claims that RediBag's customers have made against it, (e) lost profit, and (f) legal fees and employee time to handle matters related to the sanitizer recall and its aftermath, including the cost of defending against a lawsuit brought by one of RediBag's customers.

268.    As pleaded below in Count XII, all Defendants are alter egos of certain other Defendants.  Accordingly, to the extent that RediBag obtains relief pursuant to this Count against a Defendant's alter ego, that Defendant also is subject to such relief.

### COUNT II: RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d)

### (Against All Defendants)

269.    RediBag re-alleges and incorporates by reference all preceding paragraphs.

270.    All of the Defendants have agreed and conspired to violate 18 U.S.C. § 1962(c).

271.     While RediBag contends that all of the Defendants themselves committed two or more predicate acts, if any Defendant did not commit two or more predicate acts, that Defendant is still liable as a co-conspirator for the damage caused by the SBR Enterprise.

272.     The Defendants have intentionally conspired and agreed that they would conduct and participate in the conduct of the affairs of the SBR Enterprise through the pattern of racketeering activity described above.

273.     As detailed above, each of the Defendants also knowingly engaged in, facilitated, and/or coordinated criminal activities, including wire fraud.

274.     Each of the Defendants knew that the Defendants' own predicate acts and the predicate acts of other Defendants were part of a pattern of racketeering activity, and agreed to the commission of those acts to further the fraudulent scheme described above.

275.     Defendants orchestrated such criminal activities to profit through the importation and sale in the United States of hand sanitizer and other home and personal care products manufactured in Mexico, while simultaneously avoiding the consequences of misrepresenting the source and quality of the products and violating U.S. laws governing such products.  These criminal activities benefited all Defendants.

276.     That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

277.     As a direct and proximate result of the Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), RediBag has been injured in its property in that it has suffered monetary damages of more than $10 million.

278.     RediBag's damages as a result of the Defendants' violations of 18 U.S.C.

§ 1962(d) are substantially the same as its damages as a result of the Defendants' violations of 18

U.S.C. § 1962(c).

279.   As pleaded below in Count XII, all Defendants are alter egos of certain other

Defendants.  Accordingly, to the extent that RediBag obtains relief pursuant to this Count against

a Defendant's alter ego, that Defendant also is subject to such relief.

<u>**COUNT III: BREACH OF IMPLIED WARRANTY OF**</u>
<u>**MERCHANTABILITY, U.C.C. § 2-314**</u>

**(Against All Defendants)**

280.     RediBag re-alleges and incorporates by reference all preceding paragraphs.

281.     Between April 2020 and July 2020, RediBag submitted approximately 75

purchase orders to Private D for over 200,000 cases—or nearly 2.5 million bottles—of Bersih

hand sanitizer.  Private D, acting through Rozinov and Bazbaz, accepted the purchase orders, as

evidenced by Private D's issuance of invoices corresponding to the purchase orders, facilitation

of the sanitizer shipments, and acceptance of payment from RediBag.  RediBag paid Private D a

total of $9,113,851.36 for Bersih hand sanitizer.

282.     RediBag also communicated about the purchase orders directly with Solucionés,

acting through its agents Private D, Rozinov, and Bazbaz.

283.     Each of the purchase orders was a contract between RediBag and Private D.

284.     In the alternative, each of the purchase orders was a contract between RediBag

and Solucionés, acting through its agents Private D, Rozinov, and Bazbaz.

285.     The purchase orders did not disclaim any warranties.

286.    There existed in each sale of hand sanitizer to RediBag and each contract between RediBag and Private D, or, in the alternative, each contract between RediBag and Solucionés, an implied warranty that the sanitizer was merchantable.

287.    In addition, RediBag was an intended beneficiary of all agreements between Solucionés and Private D regarding the sale of hand sanitizer, each of which included an implied warranty that the sanitizer was merchantable.

288.    Private D and its agents Rozinov and Bazbaz were at all relevant times merchants with respect to sanitizer.

289.    Private D, Rozinov, and Bazbaz marketed, sold, shipped, and distributed millions of bottles of hand sanitizer.  They also held themselves out as having knowledge or skill specific to hand sanitizer.

290.    Solucionés was at all relevant times a merchant with respect to sanitizer.

291.    Solucionés manufactured, marketed, sold, shipped, and distributed millions of bottles of hand sanitizer.  Solucionés also held itself out as having knowledge or skill specific to hand sanitizer.

292.    A significant quantity of the Bersih hand sanitizer sold to RediBag contained dangerous levels of methanol and was unfit for use by consumers.  All of the Bersih sanitizer was recalled.  Accordingly, the Bersih sanitizer sold to RediBag would not pass without objection in the trade under the contract description, was not of fair average quality, did not conform to the promises and affirmations of fact made on the label, and was not fit for the ordinary purpose for which sanitizer is used.

293.    RediBag notified Private D, Rozinov, Bazbaz, and Solucionés of their breaches of the implied warranty of merchantability by informing them of the defects in the sanitizer.

50

294.     As a direct and proximate result of breaches of the implied warranty of merchantability by Private D, Rozinov, Bazbaz, and/or Solucionés, RediBag has suffered damages of more than $10 million, and incurred attorneys' fees and other legal costs.  RediBag continues to incur additional losses or liabilities not yet known.

295.     As pleaded below in Count XII, all Defendants are alter egos of certain other Defendants.  Accordingly, to the extent that RediBag obtains relief pursuant to this Count against a Defendant's alter ego, that Defendant also is subject to such relief.

### COUNT IV:  BREACH OF EXPRESS WARRANTY, U.C.C. § 2-313

**(Against All Defendants)**

296.     RediBag re-alleges and incorporates by reference all preceding paragraphs.

297.     RediBag and Private D, acting through its agents Rozinov and Bazbaz, entered into approximately 75 contracts, pursuant to which Private D sold Bersih hand sanitizer to RediBag, which RediBag in turn sold to its customers, ultimately for sale to consumers.

298.     In the alternative, RediBag and Solucionés, acting through its agents Private D, Rozinov, and Bazbaz, entered into approximately 75 contracts, pursuant to which Solucionés sold Bersih hand sanitizer to RediBag, which RediBag in turn sold to its customers, ultimately for sale to consumers.

299.     Private D, acting through its agents Rozinov and Bazbaz, expressly affirmed and promised that the sanitizer sold to RediBag would be safe and manufactured using pure ethanol sourced from the United States.  Private D, acting through its agents Rozinov and Bazbaz, also expressly described the sanitizer sold to RediBag as safe and manufactured using pure ethanol sourced from the United States.

300.     Those affirmations, promises, and descriptions became part of the basis of the bargain between RediBag and Private D.  RediBag would not have purchased the sanitizer in the

absence of those affirmations, promises, and descriptions.  Accordingly, those affirmations, promises, and descriptions created express warranties.

301.    Private D materially breached those express warranties by providing sanitizer that was unsafe and manufactured using methanol-laced ethanol sourced from Mexico.

302.    In the alternative, Solucionés, acting through its agents Private D, Rozinov, Bazbaz, Manuel Martínez, Santiago Martínez, and David Alí, expressly affirmed and promised that the sanitizer sold to RediBag would be safe and manufactured using pure ethanol sourced from the United States.  Solucionés, acting through its agents Private D, Rozinov, Bazbaz, Manuel Martínez, Santiago Martínez, and David Alí, also expressly described the sanitizer sold to RediBag as safe and manufactured using pure ethanol sourced from the United States.

303.    Those affirmations, promises, and descriptions became part of the basis of the bargain between RediBag and Solucionés.  RediBag would not have purchased the sanitizer in the absence of those affirmations, promises, and descriptions.  Accordingly, those affirmations, promises, and descriptions created express warranties.

304.    Solucionés materially breached those express warranties by providing sanitizer that was unsafe and manufactured using methanol-laced ethanol sourced from Mexico.

305.    RediBag notified Private D, Rozinov, Bazbaz, and Solucionés of their breaches of express warranties by informing them of the defects in the sanitizer.

306.    As a direct and proximate result of breaches of express warranties by Private D, Rozinov, Bazbaz, and/or Solucionés, RediBag has suffered damages of more than $10 million, and incurred attorneys' fees and other legal costs.  RediBag continues to incur additional losses or liabilities not yet known.

307.     As pleaded below in Count XII, all Defendants are alter egos of certain other Defendants.  Accordingly, to the extent that RediBag obtains relief pursuant to this Count against a Defendant's alter ego, that Defendant also is subject to such relief.

<h2 style="text-align:center">COUNT V:  NON-CONFORMING GOODS, U.C.C. § 2-608</h2>

<h3 style="text-align:center">(Against All Defendants)</h3>

308.     RediBag re-alleges and incorporates by reference all preceding paragraphs.

309.     RediBag and Private D, acting through its agents Rozinov and Bazbaz, entered into approximately 75 contracts, pursuant to which Private D sold Bersih hand sanitizer to RediBag, which RediBag in turn sold to its customers, ultimately for sale to consumers.

310.     In the alternative, RediBag and Solucionés, acting through its agents Private D, Rozinov, and Bazbaz, entered into approximately 75 contracts, pursuant to which Solucionés sold Bersih hand sanitizer to RediBag, which RediBag in turn sold to its customers, ultimately for sale to consumers.

311.     The sanitizer sold to RediBag was non-conforming.  A significant quantity of the Bersih sanitizer contained dangerous levels of methanol and was unfit for use by consumers.  All of the Bersih sanitizer was recalled.

312.     The non-conformity of the contaminated and recalled Bersih hand sanitizer substantially impaired its value to RediBag, its customers, and consumers.

313.     RediBag's initial acceptance of the hand sanitizer was reasonably induced by the assurances of Private D, Rozinov, Bazbaz, Solucionés, and the other Defendants that the sanitizer was manufactured using pure ethanol sourced from the United States and was fit for consumption by consumers.

314.     RediBag's acceptance of the hand sanitizer also was reasonably induced by the difficulty of discovering that significant quantities of the sanitizer were contaminated.  RediBag

had no reason to conduct its own testing or investigation of the sanitizer, especially in light of the falsified documentation and cherry-picked test results Defendants provided to RediBag supposedly showing that the sanitizer was methanol-free.

315.    Due to Defendants' misrepresentations, RediBag did not become aware of the non-conformity of the sanitizer until July 2020.

316.    No later than approximately July 16, 2020, two days after the sanitizer was recalled, RediBag revoked its acceptance of all recalled products and demanded that Defendants replace all recalled products.  The revocation occurred within a reasonable time after RediBag discovered the methanol contamination and the sanitizer was recalled.

317.    To the extent that RediBag is deemed to have continued to accept the recalled sanitizer, it did so based on its reasonable assumption that the nonconformity of the hand sanitizer would be cured.  That assumption was reasonable because Defendants agreed that they would provide replacement sanitizer.

318.    The non-conformity of the sanitizer has not been seasonably cured.  As discussed above, despite months of delay and repeated assurances that replacement sanitizer was forthcoming, Defendants did not provide any replacement sanitizer until July 2021, when they delivered only two truckloads of replacement sanitizer.  Most of RediBag's customers are not willing to accept replacement sanitizer at this late date, and are instead insisting on millions of dollars of cash refunds.  One customer has sued RediBag.

319.    RediBag thus has the same rights with respect to the sanitizer as if RediBag had rejected it when it was initially received.

320.    As a direct and proximate result of the non-conforming sanitizer and Defendants' failure seasonably to cure, RediBag has suffered damages of more than $10 million, and incurred

54

attorneys' fees and other legal costs.  RediBag continues to incur additional losses or liabilities not yet known.

321.    As pleaded below in Count XII, all Defendants are alter egos of certain other Defendants.  Accordingly, to the extent that RediBag obtains relief pursuant to this Count against a Defendant's alter ego, that Defendant also is subject to such relief.

## COUNT VI:  PROMISSORY ESTOPPEL

### (Against All Defendants)

322.    RediBag re-alleges and incorporates by reference all preceding paragraphs.

323.    Beginning in late March and early April 2020, Rozinov, Bazbaz, Saba, Private D, and the Solucionés Defendants promised to supply RediBag with hand sanitizer.

324.    As discussed above, those Defendants promised that the hand sanitizer was safe, complied with all applicable FDA requirements, and was made with ethanol that was nearly 100% pure and sourced from the United States.  Indeed, those Defendants distinguished their Bersih brand of sanitizer from other sanitizers based on its purported quality and purity.

325.    To bolster those promises, Bazbaz, acting on behalf of himself, Rozinov, Saba, Private D, SBR Quality Products, and the Solucionés Defendants, sent RediBag the "alcohol diligence" documents obtained by Saba.  Those documents, which appear upon closer examination to have been surreptitiously altered, purport to show that the alcohol used to manufacture the Bersih sanitizer was over 99 percent ethanol and less than .01 percent methanol, and was produced by a company in the United States.

326.    In June 2020, Bazbaz, acting on behalf of himself, Rozinov, Saba, Private D, SBR Quality Products, and the Solucionés Defendants, sent RediBag additional "alcohol supplier"

documents, including a letter from an alcohol supplier and distributor stating that Bersih was made with 99.5 percent pure ethanol.

327.    Even after the FDA recommended a recall of Bersih sanitizer on July 1, 2020, Rozinov, Bazbaz, Saba, Private D, SBR Quality Products, and the Solucionés Defendants continued to promise that the FDA was wrong, and that the hand sanitizer RediBag purchased and sold to its customers was safe, complied with all applicable FDA requirements, did not contain methanol, and was made with ethanol that was nearly 100% pure and sourced from the United States.

328.    As discussed above, Rozinov, Bazbaz, Saba, Private D, SBR Quality Products, and the Solucionés Defendants did not fulfill their promises.  A significant quantity of the sanitizer Defendants provided was not safe, did not comply with applicable FDA requirements, contained dangerous levels of methanol, and was made with methanol-laced ethanol from Mexico.

329.    As Defendants intended, RediBag reasonably and detrimentally relied on the false promises of Rozinov, Bazbaz, Saba, Private D, SBR Quality Products, and the Solucionés Defendants to purchase millions of bottles of Bersih hand sanitizer and sell them to RediBag's customers.  In the absence of such promises, RediBag would not have purchased or continued to purchase the sanitizer, and would not have sold the sanitizer to its customers.

330.    Also as Defendants intended, RediBag reasonably and detrimentally relied on the promises of Rozinov, Bazbaz, Saba, Private D, SBR Quality Products, and the Solucionés Defendants to reassure RediBag's customers that Bersih sanitizer was safe, did not contain methanol, and was made using alcohol sourced in the United States.  RediBag likewise reasonably and detrimentally relied on the promises of Rozinov, Bazbaz, Saba, Private D, SBR

Quality Products, and the Solucionés Defendants when RediBag wrote a letter to the FDA repeating Defendants' promises and attaching the "alcohol diligence" documents.  In the absence of Defendants' promises, RediBag would not have sent those communications to its customers or the FDA and instead would have begun to take action sooner to address the contaminated sanitizer.

331.    It was foreseeable that RediBag would rely on the promises of Rozinov, Bazbaz, Saba, Private D, SBR Quality Products, and the Solucionés Defendants, who were responsible for the manufacture, marketing, and sale of Bersih hand sanitizer.  The Solucionés Defendants, who were introduced to RediBag through Rozinov, Bazbaz, and Private D, had been in the business of manufacturing cosmetics with chemical compounds for years.

332.    As discussed above, starting after the recall in July and August 2020, Rozinov, Bazbaz, Private D, SBR Quality Products, and the Solucionés Defendants promised that they would provide Mexican-made replacement sanitizer to RediBag's customers, provide U.S.-made replacement sanitizer to RediBag's customers, and/or pay refunds to RediBag's customers, all at the option of the customer.

333.    As discussed above, over the next year, Rozinov, Bazbaz, Private D, SBR Quality Products, and the Solucionés Defendants continued to make a series of promises about when the replacement product could and would be delivered.

334.    Rozinov, Bazbaz, Private D, SBR Quality Products, and the Solucionés Defendants also promised that Solucionés would deposit $500,000 into an escrow account to fund customer refunds.

335.    Rozinov, Bazbaz, Private D, SBR Quality Products, and the Solucionés Defendants did not fulfill these promises.  They have provided virtually no replacement sanitizer.

The limited replacement sanitizer that was provided was not delivered until many months after the schedules promised by Defendants, after almost all customers had cancelled their orders for replacement sanitizer and demanded cash refunds instead.  Only $100,000 was deposited into the escrow account.

336.     As Defendants intended, RediBag reasonably and detrimentally relied on the promises of Rozinov, Bazbaz, Private D, SBR Quality Products, and the Solucionés Defendants to communicate to RediBag's customers what options were available to them and when the replacement sanitizer would arrive.  In the absence of Defendants' promises, RediBag would not have sent those communications to its customers and instead would have begun to take action sooner to address the contaminated sanitizer.  The false promises of Rozinov, Bazbaz, Saba, Private D, SBR Quality Products, and the Solucionés Defendants resulted in RediBag's customers contending that RediBag had lost its right to cure.

337.     It was foreseeable that RediBag would rely on the promises of Rozinov, Bazbaz, Saba, Private D, SBR Quality Products, and the Solucionés Defendants, who repeatedly told RediBag that they were working on obtaining replacement sanitizer and funding for the escrow account.

338.     As a direct and proximate result of RediBag's reasonable and detrimental reliance on Defendants' promises, RediBag has suffered damages of more than $10 million, and incurred attorneys' fees and other legal costs.  RediBag continues to incur additional losses or liabilities not yet known.

339.     As pleaded below in Count XII, all Defendants are alter egos of certain other Defendants.  Accordingly, to the extent that RediBag obtains relief pursuant to this Count against a Defendant's alter ego, that Defendant also is subject to such relief.

## COUNT VII:  BREACHES OF CONTRACTS

### (Against All Defendants)

340.    RediBag re-alleges and incorporates by reference all preceding paragraphs.

341.    RediBag and Private D, acting through its agents Rozinov and Bazbaz, entered into approximately 75 contracts pursuant to which Private D sold Bersih sanitizer to RediBag, which RediBag in turn sold to its customers, ultimately for sale to consumers.

342.    In the alternative, RediBag and Solucionés, acting through its agents Private D, Rozinov, and Bazbaz, entered into approximately 75 contracts pursuant to which Solucionés sold Bersih sanitizer to RediBag, which RediBag in turn sold to its customers, ultimately for sale to consumers.

343.    Private D, acting through its agents Rozinov and Bazbaz, expressly agreed that the sanitizer sold to RediBag would be safe and manufactured using pure ethanol sourced from the United States.  Private D materially breached the terms of its contracts with RediBag by providing sanitizer that was unsafe and manufactured using methanol-laced ethanol sourced from Mexico.

344.    In the alternative, Solucionés, acting through its agents Private D, Rozinov, Bazbaz, Manuel Martínez, Santiago Martínez, and David Alí, expressly agreed that the sanitizer sold to RediBag would be safe and manufactured using pure ethanol sourced from the United States.  Solucionés materially breached the terms of its contracts with RediBag by providing sanitizer that was unsafe and manufactured using methanol-laced ethanol sourced from Mexico.

345.    After the FDA released its findings regarding the contaminated Bersih sanitizer, Rozinov, Bazbaz, Private D, SBR Quality Products, the Solucionés Defendants, and RediBag entered into a valid contract, memorialized in the August 13 Agreement, to refund or replace the recalled sanitizer.

346.     Specifically, the parties agreed that Rozinov, Bazbaz, Private D, SBR Quality Products, and the Solucionés Defendants would provide (i) replacement Mexican-manufactured hand sanitizer, with a 10 percent extra volume of sanitizer, or (ii) replacement U.S.-made sanitizer.  Alternatively, Rozinov, Bazbaz, Private D, SBR Quality Products, and the Solucionés Defendants agreed to pay $30 per case of hand sanitizer upon return of the recalled product.

347.     Rozinov, Bazbaz, Private D, SBR Quality Products, and the Solucionés Defendants also agreed that Solucionés would deposit $500,000 into an escrow account to fund refunds to RediBag's customers.

348.     In return, RediBag agreed to inform its customers of the recall, process its customers' recall claims, and work with Rozinov, Bazbaz, Private D, SBR Quality Products, and the Solucionés Defendants to resolve those claims.

349.     As discussed above, Rozinov, Bazbaz, Private D, SBR Quality Products, and the Solucionés Defendants confirmed the terms of their agreement on multiple occasions both orally and in writing.

350.     Rozinov, Bazbaz, Private D, SBR Quality Products, and the Solucionés Defendants materially breached the terms of their contract with RediBag.

351.     Specifically, Rozinov, Bazbaz, Private D, and the Solucionés Defendants have provided no Mexican-made replacement sanitizer and virtually no U.S.-made replacement sanitizer to RediBag's customers.  The limited U.S.-made replacement sanitizer that was provided was not delivered until many months after the schedules promised by Defendants, after almost all customers had cancelled their orders for replacement sanitizer and demanded cash refunds instead.  Moreover, only $100,000 has been deposited into the escrow account.

60

352.     As a direct and proximate result of these material breaches of contracts, RediBag has suffered damages of more than $10 million, and incurred attorneys' fees and other legal costs.  RediBag continues to incur additional losses or liabilities not yet known.

353.     As pleaded below in Count XII, all Defendants are alter egos of certain other Defendants.  Accordingly, to the extent that RediBag obtains relief pursuant to this Count against a Defendant's alter ego, that Defendant also is subject to such relief.

## COUNT VIII:  DECEPTIVE ACTS AND PRACTICES, NEW YORK GENERAL BUSINESS LAW § 349

### (Against All Defendants)

354.     RediBag re-alleges and incorporates by reference all preceding paragraphs.

355.     Defendants have engaged in unfair and deceptive acts and practices in the conduct of their business in New York, including the sale of hand sanitizer.  Such unfair and deceptive acts and practices have harmed RediBag, its customers, and consumers.

356.     Defendants have perpetrated a litany of consumer-oriented deceptive acts and practices designed to dupe RediBag, its customers, and consumers.

357.     Such deceptive acts and practices include Defendants' repeated misrepresentations over many months that the Bersih hand sanitizer marketed and sold to RediBag's customers and end consumers was compliant with FDA regulations, that the alcohol used to make the hand sanitizer was pure ethanol, and that the ethanol was sourced from the United States.  Many such misrepresentations were accompanied by misleading documentation from third parties, such as the "alcohol diligence" documents and cherry-picked test results.

358.     Defendants' acts and practices were deceptive in a material way.  The purpose and effect of Defendants' misrepresentations was to induce RediBag and its customers to purchase Bersih sanitizer.  Such misrepresentations, especially when they appeared to be

supported by official-looking documentation from objective third parties, were likely to mislead a reasonable consumer acting reasonably under the circumstances.

359.     Indeed, Defendants specifically urged RediBag to market Bersih to RediBag's customers based on Bersih's supposed quality and purity.  Accordingly, RediBag relied on Defendants' misrepresentations by repeating them to RediBag's customers.  As Defendants encouraged and intended, RediBag also forwarded the "alcohol diligence" documents and cherry-picked test results to its customers.

360.     Defendants' deceptive acts and practices also were directed toward consumers. Bersih hand sanitizer was intended to be purchased and used by individual consumers to protect themselves in the face of an unprecedented public health emergency.  To protect those consumers, the FDA added Bersih to the FDA's list of sanitizer that should not be used.  Hand sanitizer is regulated by the FDA, whose mission is to protect the public.

361.     Defendants have conducted extensive business in New York.  RediBag is organized under the laws of New York, and its principal place of business is in New York.  The sanitizer invoices were directed to RediBag in New York.

362.     In addition, as Defendants are aware, many of the customers to which RediBag sold hand sanitizer sell product in New York.

363.     As a direct and proximate result of Defendants' unfair and deceptive practices, RediBag has suffered damages of more than $10 million, and incurred attorneys' fees and other legal costs.  RediBag also has been severely damaged in its business relationships with longstanding customers as well as in its public perception.  RediBag continues to incur additional losses or liabilities not yet known.

364.     As pleaded below in Count XII, all Defendants are alter egos of certain other Defendants.  Accordingly, to the extent that RediBag obtains relief pursuant to this Count against a Defendant's alter ego, that Defendant also is subject to such relief.

## COUNT IX:  FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLA. STAT. § 501.201, *ET SEQ.*

### (Against All Defendants)

365.     RediBag re-alleges and incorporates by reference all preceding paragraphs.

366.     Defendants have engaged in unfair, unconscionable, and deceptive acts and practices in the conduct of their business in Florida, including the sale of hand sanitizer.  Such unfair, unconscionable, and deceptive acts and practices have harmed RediBag, its customers, and consumers.

367.     Defendants have used deceptive practices designed to mislead RediBag, its customers, and consumers.  Defendants also used unfair trade practices that offend established public policy by being immoral, unethical, oppressive, unscrupulous, and substantially injurious to RediBag, its customers, and consumers, to the extent of causing death and disfigurement.

368.     Such unfair, unconscionable, and deceptive acts and practices include Defendants' repeated misrepresentations over many months that the Bersih hand sanitizer marketed and sold to RediBag's customers and end consumers was compliant with FDA regulations, that the alcohol used to make the hand sanitizer was pure ethanol, and that the ethanol was sourced from the United States.  Many such misrepresentations were accompanied by misleading documentation from third parties, such as the "alcohol diligence" documents and cherry-picked test results.

369.     Defendants' acts and practices were deceptive in a material way.  The purpose and effect of Defendants' misrepresentations was to induce RediBag and its customers to

purchase Bersih sanitizer.  Such misrepresentations, especially when they appeared to be supported by official-looking documentation from objective third parties, were likely to mislead a reasonable consumer acting reasonably under the circumstances.

370.    Defendants have conducted extensive business in Florida.  Rozinov is a resident of Florida.  SBR Quality Products is headquartered in Florida.  Private D uses Rozinov's address in Florida and has a bank account in Florida.

371.    In addition, as Defendants are aware, many of the customers to which RediBag sold hand sanitizer sell product in Florida.

372.    As a direct and proximate result of Defendants' unfair and deceptive practices, RediBag has suffered damages of more than $10 million, and incurred attorneys' fees and other legal costs.  RediBag also has been severely damaged in its business relationships with longstanding customers as well as in its public perception.  RediBag continues to incur additional losses or liabilities not yet known.

373.    As pleaded below in Count XII, all Defendants are alter egos of certain other Defendants.  Accordingly, to the extent that RediBag obtains relief pursuant to this Count against a Defendant's alter ego, that Defendant also is subject to such relief.

## COUNT X:  FRAUDULENT INDUCEMENT

### (Against All Defendants)

374.    RediBag re-alleges and incorporates by reference all preceding paragraphs.

375.    Throughout the period that RediBag was entering into agreements with Defendants, Defendants knowingly made false and misleading representations about material facts and omitted material facts, with the intent to defraud RediBag.  RediBag reasonably relied on Defendants' misrepresentations and omissions and suffered damages as a result.

376.     Defendants made numerous false statements regarding present facts that induced RediBag to purchase hand sanitizer from Defendants and sell it to RediBag's customers.

377.     Defendants' false statements included their assertions that Solucionés was using U.S-made ethanol manufactured by FDA-approved ethanol manufacturers and that the ethanol was the purest available.  Specific false statements made by Bazbaz, on behalf of himself, Rozinov, Saba, SBR Quality Products, Private D, and the Solucionés Defendants, and Manuel Martínez, on behalf of himself and the Solucionés Defendants, are cited above, including Bazbaz's statement on May 14, 2020 that Solucionés was "using American alcohol, made in USA with all the right paperwork" and Manuel Martínez's statements that Solucionés was using "the most purest ethanol that it could be on the market, it's the best one."

378.     Many of the Defendants' false statements were accompanied by misleading documentation from third parties, such as the "alcohol diligence" documents provided by Saba and Bazbaz and cherry-picked test results.

379.     Defendants omitted that some hand sanitizer was manufactured using alcohol sourced from Mexico.

380.     Defendants omitted that some hand sanitizer was manufactured using methanol-contaminated alcohol.

381.     As a result of Defendants' false statements and omissions, RediBag was induced to continue to send purchase orders to and enter into contracts with Private D and/or Solucionés to fill orders.

382.     Defendants knew that their statements were false when Defendants made the statements.  Defendants also knew that their omissions were misleading.

383.     Defendants' misrepresentations and omissions were material to RediBag's decision to purchase hand sanitizer from Defendants and to market and sell the hand sanitizer to its customers.

384.     The purpose and effect of Defendants' misrepresentations and omissions about the source and quality of the hand sanitizer was to induce RediBag to purchase hand sanitizer from Defendants and to market and sell the hand sanitizer to its customers.  Indeed, Defendants insisted that RediBag should repeat Defendants' statements about the provenance and purity of the Bersih alcohol to RediBag's customers to encourage them to purchase it.

385.     Defendants also made false statements and omissions in communications with RediBag regarding Defendants' capacity to produce and ship replacement sanitizer.

386.     As a result of those false statements and omissions, RediBag was induced to continue to rely on Defendants to repair the harm Defendants had caused by providing recalled, contaminated, and dangerous hand sanitizer.  In turn, these representations and omissions resulted in RediBag's customers contending that RediBag had lost its right to cure.

387.     Had RediBag known that Defendants would not provide the promised replacement product, RediBag would have sought alternative sources of hand sanitizer to repair the damage done to its customer relationships.

388.     Defendants knew that these statements were false when they made them. Defendants also knew that their omissions were misleading.

389.     Defendants' misrepresentations and omissions have caused significant harm to RediBag.

390.     As a direct and proximate result of Defendants' fraudulent conduct, RediBag has suffered damages of more than $10 million, and incurred attorneys' fees and other legal costs. RediBag continues to incur additional losses or liabilities not yet known.

391.     As pleaded below in Count XII, all Defendants are alter egos of certain other Defendants.  Accordingly, to the extent that RediBag obtains relief pursuant to this Count against a Defendant's alter ego, that Defendant also is subject to such relief.

## COUNT XI:  CIVIL CONSPIRACY

### (Against All Defendants)

392.     RediBag re-alleges and incorporates by reference all preceding paragraphs.

393.     Each of the Defendants engaged in a civil conspiracy to commit fraud, as alleged in Count X.

394.     Each of the Defendants engaged in a civil conspiracy to violate Section 349 of the New York General Business Law, as alleged in Count VIII.

395.     Each of the Defendants engaged in a civil conspiracy to violate the Florida Deceptive and Unfair Trade Practices Act, as alleged in Count IX.

396.     Each of the Defendants worked together with one or more persons to accomplish an unlawful purpose and/or an unlawful act by unlawful means.

397.     Each of the conspiracies described in this count is a continuing conspiracy, and the overt acts performed in compliance with the conspiracy's objectives are ongoing and/or have occurred within the last year.

398.     Each Defendant's actions and omissions in furtherance of the conspiracy, proximately caused and/or substantially contributed to RediBag's damages, which exceed $10 million.  RediBag continues to incur additional losses or liabilities not yet known.

399.     As pleaded below in Count XII, all Defendants are alter egos of certain other Defendants.  Accordingly, to the extent that RediBag obtains relief pursuant to this Count against a Defendant's alter ego, that Defendant also is subject to such relief.

## COUNT XII:  PIERCING THE CORPORATE VEIL/ALTER EGO LIABILITY

### (Against All Defendants)

400.     RediBag re-alleges and incorporates by reference all preceding paragraphs.

401.     RediBag seeks declarations that:

    a.  Private D and SBR Quality Products are alter egos of Rozinov;

    b.  Private D and SBR Quality Products are alter egos of Bazbaz;

    c.  Private D and SBR Quality Products are alter egos of Saba;

    d.  Private D and SBR Quality Products are alter egos of one another;

    e.  Solucionés and Euro Cosmetics are alter egos of David Alí;

    f.  Solucionés and Euro Cosmetics are alter egos of Manuel Martínez;

    g.  Solucionés and Euro Cosmetics are alter egos of Santiago Martínez;

    h.  Solucionés and Euro Cosmetics are alter egos of one another; and

    i.  For the purposes of enforcing any judgments against Defendants, RediBag is entitled to piercing of any corporate veils separating: (i) Private D and SBR Quality Products from one another and from Rozinov, Bazbaz, and Saba and (ii) Solucionés and Euro Cosmetics from one another and from David Alí, Manuel Martínez, and Santiago Martínez.

402.     Rozinov, Bazbaz, and Saba dominate, influence, and control Private D and SBR Quality Products.  They set up Private D and SBR Quality Products, using Rozinov's home addresses, to channel goods from Mexico to the United States.

403.    Rozinov, Bazbaz, and Saba are the direct, beneficial, and/or equitable owners of Private D and SBR Quality Products.

404.    Rozinov, Bazbaz, and Saba operate and control Private D and SBR Quality Products while failing to observe corporate formalities.

405.    Private D is a shell company that serves no meaningful business purpose other than to perpetrate fraud.  Its corporate status has been "inactive" since March 2017 due to delinquent taxes and failure to file annual reports.  Private D's invoices to RediBag included no contact information for Private D other than Rozinov's personal email address.

406.    Rozinov, Bazbaz, and Saba generally treat the assets of Private D and SBR Quality Products as their own.

407.    Rozinov, Bazbaz, and Saba commingle assets among Private D, SBR Quality Products, and themselves.  When convenient, Rozinov, Bazbaz, and Saba also ignore traditional rules concerning the separateness of corporate obligations.  For example, Bazbaz arranged for SBR Quality Products to wire the freight payment for a recent shipment of replacement sanitizer, even though RediBag ostensibly ordered the sanitizer from Private D, through Rozinov and Bazbaz.

408.    Rozinov, Bazbaz, and Saba undercapitalized Private D and SBR Quality Products and/or looted Private D and SBR Quality Products, even if they initially were capitalized sufficiently.

409.    Rozinov, Bazbaz, and Saba have abused the corporate form fraudulently to induce RediBag to enter into contracts for the sale of contaminated sanitizer, conduct a RICO enterprise, and avoid the consequences of misrepresenting the source and quality of the sanitizer sold to RediBag.

410.     Rozinov, Bazbaz, Saba, Private D, and SBR Quality Products have such unity of interest and ownership that the individuality of the corporations and their owners have ceased and the facts demonstrate that observance of the fiction of separate existence would, under the circumstances of this case, promote an injustice and fundamental unfairness.  Rozinov, Bazbaz, Saba, Private D, and SBR Quality Products are functioning as a single entity.

411.     David Alí, Manuel Martínez, and Santiago Martínez dominate, influence, and control Solucionés and Euro Cosmetics.

412.     David Alí, Manuel Martínez, and Santiago Martínez are the direct, beneficial, and/or equitable owners of Solucionés and Euro Cosmetics.

413.     David Alí, Manuel Martínez, and Santiago Martínez operate and control Solucionés and Euro Cosmetics while failing to observe corporate formalities.

414.     The purpose of Euro Cosmetics is to own the warehouse in Laredo, Texas to which Solucionés imports its products, including the sanitizer sold to RediBag.

415.     David Alí, Manuel Martínez, and Santiago Martínez undercapitalized Solucionés and Euro Cosmetics and/or looted Solucionés and Euro Cosmetics, even if they initially were capitalized sufficiently.

416.     David Alí, Manuel Martínez, and Santiago Martínez have abused the corporate form fraudulently to induce RediBag to enter into contracts for the sale of contaminated sanitizer, conduct a RICO enterprise, and avoid the consequences of misrepresenting the source and quality of the sanitizer sold to RediBag.

417.     David Alí, Manuel Martínez, Santiago Martínez, Solucionés, and Euro Cosmetics have such unity of interest and ownership that the individuality of the corporations and their owners have ceased and the facts demonstrate that observance of the fiction of separate existence

70

would, under the circumstances of this case, promote an injustice and fundamental unfairness. David Alí, Manuel Martínez, Santiago Martínez, Solucionés, and Euro Cosmetics are functioning as a single entity.

## **REQUEST FOR RELIEF**

WHEREFORE, RediBag respectfully requests that the Court enter judgment against Defendants for:

1. Compensatory damages to RediBag in an amount to be determined at trial;

2. Treble damages as provided by law;

3. Exemplary or punitive damages in an amount to be determined by the trier of fact as allowed by law;

4. Declarations that:

   a.  Private D and SBR Quality Products are alter egos of Rozinov;

   b.  Private D and SBR Quality Products are alter egos of Bazbaz;

   c.  Private D and SBR Quality Products are alter egos of Saba;

   d.  Private D and SBR Quality Products are alter egos of one another;

   e.  Solucionés and Euro Cosmetics are alter egos of David Alí;

   f.  Solucionés and Euro Cosmetics are alter egos of Manuel Martínez;

   g.  Solucionés and Euro Cosmetics are alter egos of Santiago Martínez;

   h.  Solucionés and Euro Cosmetics are alter egos of one another; and

   i.  For the purposes of enforcing any judgments against Defendants, RediBag is entitled to piercing of any corporate veils separating: (i) Private D and SBR Quality Products from one another and from Rozinov, Bazbaz, and Saba and (ii) Solucionés and Euro Cosmetics from one another and from David Alí, Manuel Martínez, and Santiago Martínez.

71

5.      Attorneys' fees and costs;

6.      Pre- and post-judgment interest, in amounts to be determined; and

7.      Any such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, RediBag demands trial by jury in this action of all issues triable by jury in this matter.

Respectfully submitted,

By:  /s/ Jennifer Ruiz
WEISBROD MATTEIS & COPLEY PLLC
Stephen A. Weisbrod (Florida bar no. 1019566)
Jennifer Ruiz (Florida bar no. 0967173)
Broward Financial Centre
500 E. Broward Boulevard, Suite 1700
Fort Lauderdale, FL 33394
Telephone: (954) 947-8607
sweisbrod@wmclaw.com
jruiz@wmclaw.com

Shelli Calland (*pro hac vice* to be filed)
Tamra Ferguson (*pro hac vice* to be filed)
Sophia Golvach (*pro hac vice* to be filed)
1200 New Hampshire Avenue, NW, 4th Floor
Washington, DC 20036
Telephone: (202) 499-7900
scalland@wmclaw.com
tferguson@wmclaw.com
sgolvach@wmclaw.com